## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:

Florida Extruders International, Inc.

       Debtor.

_____/

Case No.:
Chapter 11

## DEBTOR'S CHAPTER 11 CASE MANAGEMENT SUMMARY

Florida Extruders International, Inc., a Florida corporation, as debtor and debtor-in-possession ("Debtor" or "FEI"), pursuant to Administrative Order TPA-2005-2, hereby files its Chapter 11 Case Management Summary (the "Summary"), and states:

## INTRODUCTION

On April 25, 2011, the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

## I.    DESCRIPTION OF DEBTOR'S BUSINESS

Florida Extruders International, Inc. (FEI) was formed in July 1989 and is a vertically integrated manufacturing and distribution business. This includes remelting and casting of its own raw material, extruding aluminum, fabricating parts, powder coat finishing, warehousing and exporting. The recycling foundry and advanced painting facilities are environmentally safe or therefore considered as "green operations." The operational facilities are located in Sanford, Florida.

FEI concentrates currently in the following areas:

- Pool and patio enclosure extrusions sold to stocking distributors and to specialty licensed contractors;

- Custom or proprietary aluminum shapes sold to an entity that produces finished goods;

- Standard industrial architectural and structural shapes sold to a broad range of manufacturing, job shop fabricating and metal distribution companies; and

- Standard color, custom color and contract powder coat finishing that meets specified American Architectural Manufacturers Association (AAMA) performance requirements.

## II. LOCATION(S) OF DEBTOR'S OPERATIONS AND WHETHER LEASED OR OWNED

The Debtor owns the real property located at 2540-2650 Jewett Lane, Sanford, FL 32771 (the "Plant"). The Plant includes a window fabrication building, a cast house, the main extrusion building, a second extrusion building containing the 8" press, a TI building containing the 9" press, maintenance and storage, and an office building.

The Debtor also owns (i) a 197,000 sq. ft. paintline warehouse located at 2601 West 5th Street, Sanford, FL 32771, (ii) an 8.42 acre parcel of raw land on Airport Blvd. in Sanford, FL, and (iii) a 35 acre parcel of raw land located at 2305 Beardall Avenue, Sanford, FL 32771.

## III. REASON FOR FILING CHAPTER 11

Florida Extruders International, Inc. was formed in mid-1989 with 18 employees, facilities totaling 140,000 square feet, all products purchased from outside suppliers and a unique mill direct distribution business selling to pool enclosure specialty contractors statewide. Although the market did not need another stocking distributor at that time, end users perceived that the ability to buy directly from an integrated aluminum extruder located in their state offering warehousing service would realize cost and controlled quality benefits. Improved extruded and assembled products manufactured by the company such as an extruded gutter with enhanced rain carrying capacity and a higher quality screen door design were introduced. Accessories were also added to the product line for those that preferred buying from a single source. FEI had begun its evolution as a major supplier to a mature industry.

When the company was organized in 1989 it had a 7" 2200-ton extrusion press. This equipment became operational in 1991 after an extensive renovation. At the same time, FEI started its environmentally-friendly powder coating line and began to market a superior product compared to its competition that purchased liquid painted products from an outside supplier. This led to the company becoming known as an industry leader in metal finishing. After a couple of recessionary years, a 6" 1200-ton extrusion press was added in 1992 to provide needed capacity to meet its planned growth. By 1995, FEI was not only selling to the contractor but had also penetrated the stocking distributor market segment. By selling to its competitors, the company gained significantly more market share and a visible market presence second to none. Revenues in 1989 were $2,800,000 and reached $24,600,000 in 1995 under the expanded initial business model.

Since the company's inception, the focus had been to provide products primarily to the construction industry. In 1995, a new and very successful era began as FEI started shipping aluminum windows and sliding glass doors under the trade name Milestone®. These were more volume-oriented, high value-added engineered and assembled manufactured products. The company became the second largest manufacturer of these products in Florida and was recognized nationally by the industry numerous times as one of the largest residential window producers in the country.

Over the next ten years, FEI underwent a vast expansion program that included: (1)

opening its recycling foundry; (2) building a 200,000 square-foot facility on ten acres for window production and additional warehousing capacity; (3) installing an advanced powder coating line; (4) installing an 8" 2300-ton extrusion press in 1999; (5) opening nine regional building products distribution centers in strategic locations around the state; (6) purchasing 35 acres nearby with the intent to build facilities totaling approximating 500,000 square feet to support  projected growth; and (7) leasing 150,000 square feet off premise for additional warehousing space so existing production facilities could be better utilized to meet the anticipated burgeoning demand in each of its businesses.  Total revenue in 2005 reached $124,500,000, and the Debtor had just under 1,000 employees.  The window business accounted for $78,100,000 or 63% of these sales.

While the company realized only a slight downturn in revenue to $118,900,000 in 2006, the second half was far worse than the first half.  As the residential home building industry in Florida collapsed, by 2010 revenues had plummeted by 74% to $30,600,000.

A chain of events, including market conditions, financial issues and inadequate supply leading up to Chapter 11 filing are as follows:

- Chinese imports of aluminum extrusions caused market disruptions in Florida.  Since 2005, this affected all of the markets FEI served resulting in sales and margin erosion resulting in unfilled capacity.  In particular, patio extrusions sold to distributors in 2000 were $19,900,000 or 68% of the total.  In 2005, sales to this market had declined by 49% to $10,195,000 or only 24% of the total sales of this product line.

- The new residential housing industry has been decimated by excessive inventory caused by mortgage defaults, short sales, and much lower appraisals resulting in lower selling prices of existing homes.

- The state of the housing market and the buying pressures exerted by financially-troubled builders resulted in lower window selling prices although the company had incurred uncontrollable increases in material and operating costs that it could not recover.

- Florida has progressively changed its energy code to higher performance standards resulting in many of the national and regional production builders opting for vinyl windows.

- The commercial building market has been affected by the inability to get adequate lending as larger projects have been delayed and cancelled.

- The home improvement industry was harmed by changes in consumer credit ratings and manufacturers of certain items eliminating inventory financing arrangements to their dealers.

- All FEI distribution centers were closed as of December 2009.  It was determined that due to the state of the industry that they were too costly to continue to operate.

- High unemployment affected disposable income needed to purchase goods and services to stimulate a weakened economy.

- Suppliers were also affected by the declining economy and market conditions causing them to reduce their credit terms and restrict customer purchases.

- Many of the company's customers have slowed their payments, gone out of business or just refuse to pay contributing to the company's severe cash flow problem.

- As a result of the adverse conditions FEI has been unable to obtain adequate funding to pay its suppliers within their terms. It has also affected the company's ability to purchase materials to meet their customer's production requirements.

- Not withstanding the closing of the window business in February 2011 and all of the factors listed above, it needs to be noted that FEI developed new products, attempted to penetrate new markets and purchased additional high speed equipment to achieve cost reductions and production efficiencies. Taking this into account, the company has shown an increase in capitalized fixed assets of $17,000,000 over the last seven years.

- It turned out that the business could not sustain the unexpected severe downturn that was to come. These capital investments and development activities included: (1) automated insulated glass equipment; (2) a tempered glass production line; (3) a new engineered commercial window product line that received both Florida and Metro-Dade approvals but the demand and the inability to fund its marketing both dried up; (4) purchasing hundreds of standard industrial shape dies including various angles, bars, channels, pipe and tubes as well as complimentary material such as sheet products and then inventorying them in a multitude of stocking units to service a broad range of large and small users that were sold at the distribution centers; (5) an ornamental aluminum fencing business that had much promise but could not reach its potential due to the state of the economy causing the company to discontinue it in March 2011; and (6) a fourth and larger 9" 3000-ton extrusion press with upwards of 40% more production capacity than the other three extrusion presses combined and that would also fill a supply void resulting in a significant increase in the sales and value of the company; however, the installation could not be completed due to lack of funding.

At the present time, the Debtor's level of debt is currently unsustainable and the Debtor has been unable to restructure its debts outside of bankruptcy. With the cooperation of the Debtor's largest secured creditor, Wells Fargo Bank (who will fund operating shortfalls), the Debtor will quickly submit a liquidating plan to sell all or substantially all of its assets to the highest bidder on a going concern basis through the Chapter 11 process. The Debtor believes this sale will ultimately provide all parties in interest significantly more through its plan of reorganization than they would otherwise realize in the event of a liquidation.

## IV.   LIST OF OFFICERS AND DIRECTORS AND THEIR SALARIES AND BENEFITS AT TIME OF FILING AND DURING ONE YEAR PRIOR TO FILING

1.   Time of Filing:

| Name | Title | Salary |
|---|---|---|
| Joel Lehman | President | $225,000.00 |
| Bennet Yanowitz | Secretary | $0 |
| Earl Moore | Assistant Secretary | Commission only ($12,000.00 since February 25, 2011) |
| Martin Elrad | Director | $0 |
| David Kahan | Director | $0 |
| Marva Lehman | Director | $0 |

2.   One Year Prior to Filing:

| Name | Title | Salary |
|---|---|---|
| Joel Lehman | President | $459,000.00 |
| Bennet Yanowitz | Secretary | $0 |
| Earl Moore | Assistant Secretary | $67,000.00 |
| Martin Elrad | Director | $0 |
| David Kahan | Director | $0 |
| Marva Lehman | Director | $0 |

## V.   DEBTOR'S ANNUAL GROSS REVENUE

| 2009: | approximately $35,558,559 |
|---|---|
| 2010: | approximately $30,643,375 |
| 2011 through April 21: | approximately $4,796,329 |

## VI.   AMOUNTS OWED TO VARIOUS CLASSES OF CREDITORS

The Debtor may owe approximately the following amounts to the following classes of creditors, certain amounts of which may be subject to dispute:

| Priority Creditors: | None |
|---|---|
| Taxes and other certain unsecured priority debts (including property taxes): | $792,000 |
| Secured Creditors: | $13,423,000 |
| Unsecured Creditors: | $2,721,000 |

## VII.  GENERAL DESCRIPTION AND APPROXIMATE VALUE OF DEBTOR'S CURRENT AND FIXED ASSETS

As of the date of its petition, Debtor had the following assets in the <u>approximate</u> values indicated below, all at non-depreciated book value wherever applicable:

| Cash | $0 |
|---|---|
| Security Deposits | $475,000 |
| Accounts Receivable | $3,172,856 |
| Inventory | $2,534,116 |
| FF&E | $7,565,820 |
| Rolling Stock | $51,000 |
| Liquidated/Contingent/Unliquidated Claims | $2,168,000 |
| 2540-2650 Jewett Lane | $3,671,000 |
| 2601 W 5th St. (improved) | $4,159,000 |
| Airport Blvd. (raw land) | $1,004,000 |
| 2305 Beardall Ave. (raw land) | $1,460,000 |

## VIII.  NUMBER OF EMPLOYEES AND AMOUNT OF WAGES OWED AS OF PETITION DATE

The Debtor currently has 26 employees.  As of the Petition Date, the Debtor's accrued payroll obligations are approximately $27,000.00.

## IX.  STATUS OF DEBTOR'S PAYROLL AND SALES TAX OBLIGATIONS

The Debtor currently owes approximately $27,000 in gross wages for the pre-petition period beginning April 18, 2011, and ending April 24, 2011.  The Debtor is current on its payroll tax obligations.

The Debtor owes approximately $8,875.51 for March 2011 sales taxes that were due on April 20, 2011.

## X.  ANTICIPATED EMERGENCY RELIEF WITHIN 14 DAYS OF PETITION DATE

1. Motion for Order Authorizing the Use of Cash Collateral of Wells Fargo Bank.
2. Application to Employ Triton Capital Partners, LTD as financial advisor and investment banker
3. Application to Employ Kapilla & Company as Debtor's Accountant
4. Motion for Authority to Obtain Debtor In Possession Financing
5. Motion for Authority to Pay Pre-Petition Wages
6. Motion for Authority to Pay Affiliate Officer Salaries
7. Application to Employ McIntyre, Panzarella, Thanasides et al. as Debtor's counsel.

8. Motion for Order Establishing Adequate Assurance for Payment of Utilities

   **WHEREFORE**, Debtor, Florida Extruders International, Inc., respectfully submits this Case Management Summary.

   Respectfully submitted,

   */s/ Christopher C. Todd*
   RICHARD J. MCINTYRE
   Florida Bar No. 0962708
   rich@mcintyrefirm.com
   CHRISTOPHER C. TODD
   Florida Bar No. 0072911
   chris@mcintyrefirm.com
   MCINTYRE, PANZARELLA, THANASIDES,
       HOFFMAN, BRINGGOLD & TODD, P.L.
   6943 E. Fowler Avenue
   Tampa, Florida 33617
   813.899.6059
   813.899.6069 (F)
   *Attorneys for the Debtor*

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on this 26th day of April 2011 the foregoing Case Management Summary was furnished via CM/ECF and/or US Mail to all parties in interest listed on the attached mailing matrix.

   */s/ Christopher C. Todd*
       Attorney