**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

Florida Extruders International, Inc.

    Debtor.
_____/

Case No.: 8:11-bk-07761-KRM
Chapter 11

*Emergency Relief Requested*

**EMERGENCY MOTION FOR ORDER: (I) AUTHORIZING DEBTOR TO USE CASH COLLATERAL, (II) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SUPER-PRIORITY, SECURED AND PRIMING BASIS, (III) MODIFYING THE AUTOMATIC STAY, (IV) APPROVING SONEET R. KAPILA AS CHIEF RESTRUCTURING OFFICER, (V) GRANTING INTERIM RELIEF, AND (VI) SCHEDULING A FINAL HEARING**

Florida Extruders International, Inc., as debtor and debtor in possession (the "Debtor"), moves for entry of an interim order (the "Interim Order") and a final order (the "Final Order") pursuant to §§ 105, 361, 362, 363, 364, 541 and 1105 of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, (i) authorizing the Debtor to use cash collateral, (ii) authorizing the Debtor to obtain post-petition financing by granting replacement liens, first priority priming liens and super-priority claim status, (iii) modifying the automatic stay as to the Debtor's primary secured creditor, Wells Fargo Bank, N.A., as successor to Wachovia Bank, National Association and SouthTrust Bank ("Wells Fargo"), (iv) approving Soneet R. Kapila as the Chief Restructuring Officer of the Debtor, (v) granting interim relief and (vi) scheduling a final hearing (the "Motion").

**FACTUAL BACKGROUND**

1.    On April 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1

2. The Debtor continues to operate its business and manage its assets as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in the Middle District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested by this Motion are Bankruptcy Code Sections 105, 361, 362, 363, 364 and 1105 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.

5. For a detailed description of the Debtor, its operations, assets and liabilities, the Debtor refers the Court and parties in interest to the Case Management Summary filed on April 26, 2011. (ECF No. 7).

6. The Debtor believes the highest value of its assets can best be realized through a sale of its business operations as a going concern. In order to continue its operations until the business can be sold, the Debtor must use cash collateral and must also obtain post-petition financing on the terms described below.

7. Wells Fargo, as lender, and the Debtor, as borrower, are parties to (i) a Revolving Line of Credit dated May 19, 2008, in the original principal amount of $10,000,000, (ii) a Real Estate Term Loan dated July 10, 2007, in the original amount of $4,155,933.63, (iii) an Equipment Guidance Line Loan dated March 18, 2005, in the original principal amount of $10,000,000, (iv) the $598,285.22 outstanding letter of credit issued by Wells Fargo at the request of the Debtor as Applicant in favor of Liberty Mutual Insurance Company as Beneficiary (the "Letter of Credit"), and (v) an interest rate swap transaction with reference number 1724698 evidenced by a Swap Transaction

Confirmation dated February 1, 2008, part of and subject to the ISDA Master Agreement and Schedule thereto dated January 30, 2008 (the "Swap Agreement") (collectively, the "Pre-Petition Loans").

8. As of the Petition Date, the outstanding principal and accrued, but unpaid, interest owed to Wells Fargo under the Pre-Petition Loans is approximately $13,200,000 including contingent liabilities under the Letter of Credit and the Swap Agreement.

9. The Pre-Petition Loans are secured by valid, binding and non-avoidable first priority liens on most of the Debtor's real and personal property used in its business (collectively, the "Wells Fargo Pre-Petition Collateral"). The Pre-Petition Loans are not secured by the Debtor's real property located at 2305 Beardall Avenue, Sanford, Florida 32771, which secures the Debtor's indebtedness to Hunter Douglas Metals, Inc. (the "2305 Beardall Property").

10. The Wells Fargo Pre-Petition Collateral includes as of the Petition Date over $3,000,000 in cash, accounts receivable and other cash equivalents (collectively, the "Cash Collateral"). The Debtor cannot fund its day-to-day operations without the use of the Cash Collateral. And, even with the use of Cash Collateral, the Debtor needs additional capital if it is to recognize the highest value of its assets through a sale of its business as a going concern. The Debtor's cash disbursements over the next 13 weeks are projected to exceed its cash receipts by $1,000,000.

11. The Debtor's ability to use Cash Collateral and obtain sufficient working capital by incurring post-petition indebtedness pursuant to the terms described below is vital to the preservation of the value of the Debtor's assets and is necessary to effect a sale of the Debtor's business as a going concern for the benefit of its creditors.

12. Because the Debtor's assets are fully encumbered, there is no value to junior lienholders or to the Debtor's estate if Wells Fargo were to enforce its liens and claims under applicable non-bankruptcy law.

13. In the exercise of its sound business judgment, the Debtor has determined that securing post petition working capital is the only manner in which it can preserve the value of its assets and continue its operations.

14. Following negotiations, the Debtor and Wells Fargo agreed to the terms of a revolving line of credit facility that would allow the Debtor to use Cash Collateral and obtain post-petition working capital up to an aggregate principal amount not to exceed $3,000,000 (the "DIP Financing"). The terms of the DIP Financing are conditioned, in part, on the appointment of a Chief Restructuring Officer ("CRO"). Pending entry of a Final order approving the DIP Financing and provided Wells Fargo has approved a 13 week cash flow budget prepared by the CRO, advances under the DIP Financing will not exceed $500,000. Upon the CRO's request and Wells Fargo's written approval (which may be granted or withheld in Wells Fargo's sole discretion), the DIP Financing may be increased to up to $7,500,000 under the DIP Loan Agreement described below. All cash receipts received by the Debtor on a post-petition basis will be deposited in the Debtor's account with Wells Fargo, swept daily and applied to the indebtedness owed under the Pre-Petition Loans. Amounts so applied will be available to be advanced under the DIP Financing as required by the CRO's budget, as approved by Wells Fargo.

15. Upon entry of the Final Order, the Debtor and Wells Fargo intend to execute a Debtor-In-Possession Credit and Security Agreement and other definitive loan documents (together with all related documents, the "DIP Loan Agreement"). A copy of

the DIP Loan Agreement will be filed no later than two business days prior to the final hearing on this Motion.

16. The primary provisions of the DIP Loan Agreement and the interim DIP Financing for which this Motion seeks approval are as follows.[1]

<u>Borrowers</u>: Florida Extruders International, Inc. as debtor in possession.

<u>Lender</u>: Wells Fargo Bank, N.A.

<u>Chief Restructuring Officer</u>: The Debtor will retain the services of a CRO acceptable to Wells Fargo to manage and supervise, as an agent of the Debtor with full powers of substitution, all administrative and executive functions relating to the Debtor's business. The CRO will be endowed with all authority vested in the Debtor's board of directors and chief executive officer, and will have discretionary authority to undertake all actions that he deems necessary or appropriate to successfully manage the Debtor's business, to preserve and maximize the value of the Debtor's assets and to market and sell the Debtor's business as a going concern and/or sell or otherwise liquidate assets in one or more sales under

---

[1] The description of the DIP Loan Agreement herein is intended solely to provide the Court and interested parties with a brief overview of its significant terms. For a complete description of the terms and conditions of the DIP Financing, reference should be made to the DIP Loan Agreement, as such will be filed at least two business days prior to the final hearing on this Motion.

|  |  |
|---|---|
| | Section 363 of the Bankruptcy Code. Soneet R. Kapila has been selected to serve as the CRO. |
| Credit Facility: | A revolving line of credit in a principal amount not to exceed the lesser of $3,000,000 or 105% of the amount required pursuant to the CRO's budget, as approved by Wells Fargo in its sole discretion (the "Revolving Loan"). Upon request of the CRO and with the written approval of Wells Fargo (which approval may be granted or withheld by Wells Fargo in its sole discretion), the Revolving Loan may be increased up to an aggregate amount not exceeding the sum of $7,500,000. |
| Availability: | Advances under the Revolving Loan will be available immediately upon entry of the Interim Order, subject to the provisions of the DIP Loan Agreement. Until the CRO Budget is approved and a Final Order is entered, advances will not exceed $500,000. |
| Application of Cash to Lender's Pre-Petition Loans: | All cash received by the Debtor from sales, collection of accounts receivable or otherwise will be applied to reduce the Pre-Petition Loans to the Debtor and will then be available to be advanced under the Revolving Loan. |
| Use of Proceeds: | Subject to the CRO's budget, as approved by Wells Fargo in its sole discretion, advances under the Revolving Loan |

|  | will be available exclusively for funding costs and expenses related to the Chapter 11 case, the DIP Loan Agreement and the Debtor's working capital needs to the extent related to the Debtor's ongoing business operations, including (i) the costs of administering the Revolving Loan in accordance with the terms of the DIP Loan Agreement, (ii) the reimbursement of all costs incurred by Wells Fargo in connection with the Chapter 11 case, (iii) all costs, including United States Trustee fees incurred by, through or under the CRO, (iv) the costs of managing, securing, insuring and safeguarding the value of the Debtor's business, (v) the costs of marketing and otherwise preparing the Debtor's business for sale, and (vi) other costs and expenses related to the Chapter 11 case, the DIP Loan Agreement or the Debtor's business, all as contemplated by and provided for in a 13 week budget detailing operations, costs, expenses and Amount Required to Borrow as approved by Wells Fargo in its sole discretion (the "CRO Budget"). The CRO Budget will be updated and compared to actual results on a weekly basis. |
|---|---|
| <u>Financial Terms</u>: | Prior to the occurrence of an event of default, the outstanding principal balance of the Revolving Loan shall bear simple interest at Wells Fargo's Prime Rate plus 3% |

|  |  |
|---|---|
|  | (the "Note Rate"). Upon the occurrence of any event of default, and for as long as the same shall remain outstanding, at the option of Wells Fargo, all obligations of the Debtor shall bear interest at the Note Rate plus 5%. The Debtor authorizes Wells Fargo to make Revolving Loan advances for payment of accrued and unpaid interest when due and payable under the Revolving Loan. |
| Fees and Expenses: | The Debtor shall pay Wells Fargo (i) a monthly administrative fee of $10,000; (ii) a commitment fee of $25,000 deemed fully earned by Wells Fargo and due and payable by the Debtor upon entry of the Interim Order; and (iii) other charges as set forth in the DIP Loan Agreement. |
| Super Priority: | The Debtor's obligations under the DIP Loan Agreement will be administrative expenses with priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code. |
| Maturity: | The earlier to occur of (i) the date that is 120 days after the Petition Date, or (ii) the date upon which Wells Fargo elects to terminate in accordance with the DIP Loan Agreement. |
| Collateral: | Other than the Debtor's interest in the 2305 Beardall Property, all of the Debtor's assets of every type and |

character (real, personal or mixed) (collectively the "Collateral").

Liens and
Lien Priority: Subject to any valid and perfected liens or security interests in favor of any governmental entity for unpaid property taxes, the obligations of the Debtor under the DIP Loan Agreement will be secured by first priority liens and security interests on the Collateral, all of which shall prime and be senior to any pre-petition liens or security interests. In addition, the Debtor will grant replacement liens on all post-petition Cash Collateral notwithstanding Section 552 of the Bankruptcy Code.

Perfection: The creation, perfection and priority of the liens granted to Wells Fargo under the DIP Loan Agreement will be automatic, without the necessity of the execution, delivery or recordation of any filings, registrations or other notifications by the Debtor or Wells Fargo of any security agreements, mortgages, financing statements, pledge agreements, control agreements or other similar agreements, documents or notices. Notwithstanding the foregoing, Wells Fargo will be authorized to obtain and or file, and the Debtor will so provide, any of the foregoing upon the request of Wells Fargo in the exercise of its sole discretion.

| | |
|---|---|
| <u>Covenants</u>: | Usual covenants for transactions of this kind including without limitation, affirmative and negative covenants with respect to other indebtedness, as well as restrictions against any change in management, the granting of new liens, and the disposition of any assets, without Wells Fargo's consent. |
| Funding <u>Conditions</u>: | Usual conditions for transactions of this kind including, without limitation, entry of the Interim Order and Final Order satisfactory in form and substance to Wells Fargo that approve, grant and authorize (i) the transactions contemplated by the DIP Loan Agreement, (ii) first priority priming liens, replacement liens and super-priority administrative claim status described in the DIP Loan Agreement, and (iii) the retention of the CRO. |
| Events of <u>Default</u>: | The DIP Loan Agreement includes default provisions customarily contained in agreements for similar debtor in possession financings including, without limitation, conversion of the case to Chapter 7 of the Bankruptcy Code, appointment of a Chapter 11 trustee, termination of the CRO for any reason without the consent of Wells Fargo, dismissal of the Chapter 11 case, and/or failure to make payments to Wells Fargo when due. |

Section
363 Sales: Pursuant to the authority granted under the Interim Order and the Final Order, Wells Fargo will be entitled to file motions with the Court seeking approval to sell the Debtor's business and/or Collateral outside the ordinary course of business pursuant to Section 363 of the Bankruptcy Code. The Debtor agrees to cooperate fully in the consummation of any sale under Section 363 that is approved by the Court. The Court will be authorized to approve such sales under Section 363 even if junior lien holders will not be paid in full from the proceeds of such sales. Further, in the event of any sale of the Debtor's business or the Collateral pursuant to a sale under Section 363 or under a plan of reorganization, Wells Fargo will have the right (in an auction or otherwise) to credit bid in an amount equal to the amount of the Debtor's pre-petition and post-petition indebtedness to Wells Fargo.

Stay Relief: Effective at any time upon five days notice to the Court filed by Wells Fargo that an event of default has occurred under the DIP Loan Agreement, Wells Fargo will be granted full and complete relief from the automatic stay imposed by Section 363 of the Bankruptcy Code, to pursue any and all remedies to which it may be entitled. These remedies include the right to demand immediate possession

of the Collateral (or any portion thereof), and to liquidate the same in the manner provided by applicable law. This stay relief is effective without further order of or application to the Court, but with five days notice of any such action provided to the Court and to any creditor of the Debtor entitled to notice with respect to any Collateral. Prior to any such notice to the Court, all Collateral will remain property of the Debtor's estate subject to disposition as provided in the DIP Loan Agreement.

Release of Claims: The Debtor, for and on behalf of itself and all those claiming by, through or under it including, without limitation, its bankruptcy estate and the CRO, their successors and assigns (collectively, the "Releasing Parties"), agree to remise, release and forever discharge Wells Fargo, its respective affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, attorneys, successors, and assigns (collectively, the "Released Parties"), of and from any and all claims, demands, liabilities, actions and causes of action of every kind or nature, whether known or unknown, suspected or unsuspected, contingent or matured, concealed, hidden, latent or patent, which may now exist or may in the past

|  | have existed, arising out of or in any way connected with any occurrences, acts, omissions, or transactions involving, directly or indirectly, the Debtor, the CRO, the Pre-Petition Loans, the Chapter 11 case or the negotiation and execution of the DIP Loan Agreement, from the beginning of time through the Petition Date (collectively, the "General Release"). |
|---|---|
| Exculpation: | Neither the Debtor nor its officers, directors, attorneys, accountants or agents shall have any liability for any act or omission of the CRO in connection with, relating to, or arising out of the DIP Financing, the DIP Loan Agreement, any document or agreement created or entered into in connection with the DIP Financing, or the administration and implementation of the DIP Financing. |
| Other Provisions: | The DIP Loan Agreement provides for certain representations and warranties customary for transactions of this kind, all as more fully set forth in the agreement. |

# ARGUMENT

### A. Approval of Use of Cash Collateral.

17. Section 363(c)(2) of the Bankruptcy Code prohibits a debtor from using cash collateral unless the secured lender consents or, after notice of hearing, the Court authorizes its use. In addition, Section 363(e) of the Bankruptcy Code provides that on a request of a secured lender the Court shall prohibit or condition such use as is necessary to provide adequate protection to the lender.

18. Wells Fargo has consented to the use of its Cash Collateral under the terms of the DIP Loan Agreement, and only if the agreement is approved pursuant to an Interim Order and a Final Order. The Debtor submits that the DIP Loan Agreement provides built-in adequate protection including (i) replacement liens and security interests in all post-petition Cash Collateral to secure the Pre-Petition Loans notwithstanding Section 552 of the Bankruptcy Code, and (ii) the approval of a CRO to protect the Collateral and preserve the value of the Debtor's business.

### B. Approval of Financing.

19. If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt:

> (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

20. In the event a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien." Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted.

21. The Debtor has been unable to procure the required funds in the form of unsecured credit or unsecured debt with an administrative priority. In addition, the Debtor has been unable to procure the required funds solely under Sections 364(c) and (d) of the Bankruptcy Code. The Debtor heavily negotiated the proposed post-petition financing set forth in this Motion at arm's-length and pursuant to the Debtor's business judgment. The terms and provisions of the DIP Loan Agreement are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtor could obtain post-petition financing.

22. Among other things, the post-petition financing will enable the Debtor to (a) maintain the continuity of its operations and (b) maximize the value of its business as a going concern for sale for the benefit of the Debtor's estate and creditors.

### C. Adequate Protection.

23. Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the Court will prohibit or condition such use as is necessary to provide adequate protection of such interest.

24. A debtor has the burden to establish that the holder of a lien to be subordinated has adequate protection. Section 363(o)(1); *see also In re Swedeland*

*Development, Co., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). Adequate protection must be determined on a case-by-case basis, permitting a debtor maximum flexibility in structuring its adequate protection proposal. *Id.*; *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re George Ruggerie Chrysler-Plymouth, Inc*., 727 F.2d 1017, 1019 (11th Cir. 1984).

25. The liens granted to Wells Fargo to secure the obligations under the DIP Financing and/or DIP Loan Agreement will not prime any liens other than the liens held by Wells Fargo as of the Petition Date and liens junior to Wells Fargo's liens.

26. To the extent there are junior lienholders primed by the DIP Financing and/or DIP Loan Agreement, there is no need for adequate protection since it is undisputed that the liens of those creditors would be extinguished if Wells Fargo were to enforce its rights under applicable non-bankruptcy law. Absent the financing, the Debtor's would abandon the Collateral to Wells Fargo and Wells Fargo would be free to enforce its senior liens and claims under state law.

### F. Interim Approval Should Be Granted.

27. Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure provide that a final hearing on a motion to use cash collateral pursuant to Section 363 and to obtain credit pursuant to Section 364 may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

28. Pursuant to Rules 4001(b) and 4001(c), the Debtor requests that the Court conduct an expedited preliminary hearing on the Motion (the "Interim Hearing") and grant the relief requested in the proposed Interim Order so as to (a) maintain the Debtor's ongoing operations and (b) avoid the immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

29. The Debtor has an urgent and immediate need for cash to continue to operate. The Debtor will be immediately and irreparably harmed absent authorization from the Court to obtain secured credit as requested on an interim basis pending a final hearing on the Motion.

### G. Approval of Soneet R. Kapila As Chief Restructuring Officer

30. Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the approval of the provisions of this title." Section 363(b) provides that a debtor-in-possession "after notice and hearing, may use, sell or lease other than in the ordinary course of business property of the estate." Under applicable case law, in this and other circuits, if a debtor's proposed use of its assets pursuant to Section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See, e.g., In re Gulf States Steel, Inc.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002).

31. The retention of Soneet R. Kapila as CRO of the Debtor is proper under Section 363 of the Bankruptcy Code. Numerous courts have authorized retention of employees to provide restructuring services and interim management services under Section 363 of the Bankruptcy Code. *See, e.g., In re Puig, Inc., et al*. (Case No. 07-

14026)(RAM) (Bankr. S.D. Fla. July 20, 2007); *In re AT&T Latin America Corp.*, et al. (Case No. 03-13538) (RAM) (Bankr. S.D. Fla. June 11, 2003). The Debtor submits that the employment of Soneet R. Kapila as CRO would greatly benefit the Debtor's estate and creditors. Accordingly, this Court should approve the Debtor's retention of Soneet R. Kapila as CRO of the Debtor.

32. The terms of the engagement and power, authority and duties of the CRO are described in paragraph 16 above and are set forth in a written agreement between the Debtor and Mr. Kapila, a copy of which is attached hereto as **Exhibit A** (the "Chief Restructuring Officer Agreement").

## REQUEST FOR FINAL HEARING

33. To avoid an event of default under the DIP Loan Agreement, the Debtor also requests that the Court schedule a final hearing, with objections, if any, to the Final Order being due in writing on or before the date that is at least 5 business days prior to the final hearing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtor respectfully requests that the Court enter an order (I) AUTHORIZING DEBTOR TO USE CASH COLLATERAL, (II) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON A SUPER-PRIORITY, SECURED AND PRIMING BASIS, (III) MODIFYING THE AUTOMATIC STAY, (IV) APPROVING SONEET R. KAPILA AS CHIEF RESTRUCTURING OFFICER, (V) GRANTING INTERIM RELIEF, AND (VI) SCHEDULING A FINAL HEARING, and for such other relief the Court deems proper.

Dated: April 26, 2011.

    Respectfully submitted,

    /s/ Christopher C. Todd
    RICHARD J. McINTYRE, ESQUIRE
    Florida Bar No. 0962708
    rich@mcintyrefirm.com
    CHRISTOPHER C. TODD, ESQUIRE
    Florida Bar No. 72911
    chris@mcintyrefirm.com
    McIntyre, Panzarella, Thanasides,
     Hoffman, Bringgold & Todd, P.L.
    400 N. Ashley St., Ste. 1500
    Tampa, Florida 33602
    (813) 899-6059
    (813) 899-6069 (Facsimile)
    *Attorneys for Debtor*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion has been furnished on this 26th day of April, 2011, via the Court's CM/ECF system or U.S. Mail to:

**U.S. Trustee Office**, 501 East Polk Street, Ste 1200, Tampa, Florida 33602

**Florida Extruders International;** 2540 Jewett Lane, Sanford, Florida 32771

**Attorney for Debtors**

**Wells Fargo Bank, N.A.,** c/o Michael E. Demont, Smith, Hulsey & Busey, 225 Water St., Suite 1800, Jacksonville, FL 32202 (via certified U.S. Mail)

**LBR 1007-2 Parties in Interest List**

/s/ Christopher C. Todd
    Attorney