In re:

                                          Case No.:  8:11-bk-07761-KRM

Florida Extruders International, Inc.          Chapter 11

      Debtor.

_____/

**DEBTOR'S DISCLOSURE STATEMENT FOR**
**THE PLAN OF LIQUIDATION**

Christopher C. Todd, Esq.
Richard J. McIntyre, Esq.
McIntyre, Panzarella, Thanasides,
    Hoffman, Bringgold & Todd, P.L.
400 N. Ashley Dr., Ste. 1500
Tampa, FL 33602

June 2, 2011

# I. INTRODUCTION

This is the Disclosure Statement (the *"Disclosure Statement"*) for the Chapter 11 case of Florida Extruders, Inc., a Florida corporation, (the *"Debtor"* or the *"Company"*). The Debtor filed its Voluntary Petition for Relief in the Middle District of Florida, Tampa Division (the *"Court"* or *"Bankruptcy Court"*), under Chapter 11 of the United States Bankruptcy Code on April 25, 2011 (the *"Petition Date"*). This Disclosure Statement contains information about the Debtor and describes the Debtor's proposed Plan of Liquidation (the *"Plan"*), filed on June 2, 2011.

*Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distribution to **General Unsecured Creditors** under the Plan is discussed in the Plan and this Disclosure Statement. General Unsecured Creditors are classified in **Class 6.**

## A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the Plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the *"Court"*) will consider when deciding whether to confirm the Plan,
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

**Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.**

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This Section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. The **Hearing** at which the Court will determine whether to approve the Plan and this Disclosure Statement (the Court has conditionally approved it) will take place on the dates set forth within the Order Conditionally Approving Disclosure Statement (the *"Order"*) which

has been provided within this package, in Tampa, FL, in Courtroom 9B, at the Sam M. Gibbons Courthouse, 801 N. Florida Avenue, Tampa, Florida.

2.     Ballots: If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to the U.S. Bankruptcy Court, 801 N. Florida Ave., Tampa FL 33602 and send a copy to McIntyre, Panzarella, Thanasides, Hoffman, Bringgold & Todd, P.L., 400 N. Ashley St., Suite 1500, Tampa, Florida 33602.  See Section IV A. below for a discussion of voting eligibility requirements. A sample form of Ballot is attached as **Exhibit A** to this Disclosure Statement, in addition to the ballot enclosed with the mailing of this Disclosure Statement.  **You must file your ballot with the Court, on or before the deadline set forth within the Order which has been provided within this package.**

3.     Objections to the Confirmation of the Debtor's Plan or to this Disclosure Statement must be filed with the Court and served upon the Debtor and all parties in interest on or before the deadline set forth within the Order which has been provided within this package.

4.     If you want additional information about the Plan, you should contact Christopher C. Todd, McIntyre, Panzarella, Thanasides, Hoffman, Bringgold & Todd, P.L., 400 N. Ashley St., Suite 1500, Tampa, Florida 33602, or via email at: chris@mcintyrefirm.com.

**C.     Disclaimer**

*The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has conditionally approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.  The Court's conditional approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan.  Objections to the adequacy of this Disclosure Statement must be filed on or before the deadline set forth within the Order which has been provided within this package.*

## II.     BACKGROUND

### A.     Description and History of the Debtor's Business

Florida Extruders International, Inc. ("**FEI**") was formed in July 1989 and is a vertically integrated manufacturing and distribution business. This includes remelting and casting of its own raw material, extruding aluminum, fabricating parts, powder coat finishing, warehousing and exporting. The recycling foundry and advanced painting facilities are environmentally safe or therefore considered as "green operations." The operational facilities are located in Sanford, Florida.

FEI concentrates currently in the following areas:

- Pool and patio enclosure extrusions sold to stocking distributors and to specialty licensed contractors;

- Custom or proprietary aluminum shapes sold to an entity that produces finished goods;

- Standard industrial architectural and structural shapes sold to a broad range of manufacturing, job shop fabricating and metal distribution companies; and

- Standard color, custom color and contract powder coat finishing that meets specified American Architectural Manufacturers Association (AAMA) performance requirements.

See **Events Leading to Chapter 11 Filing** below, for additional information

**Development:  Current State and Future Plans**

The Debtor's revenue has decreased substantially from its peak just a few years ago and the Debtor has been unable to restructure its current secured debt obligations to Wells Fargo Bank or adequately provide for the use of the bank's cash collateral.  The Debtor intends to sell substantially all of its going concern assets via auction, free and clear of all claims, interests and encumbrances through a 363 sale and pursuant to the Plan.

**B.      Insiders of the Debtor**

| Name | Title(s) |
|---|---|
| Joel Lehman | President, Director, 40% shareholder |
| Soneet Kapila | Chief Restructuring Officer |
| Bennet Yanowitz | Secretary |
| Earl Moore | Assistant Secretary |
| Martin Elrad | Director |
| David Kahan | Director |
| Marva Lehman | Director |

**C.      Management of the Debtor Before, During and After the Bankruptcy**

**1.  Management – Past two years:** During the two years prior to the Petition Date, the officers, directors, managers or other persons in control of the Debtor were:

| Name | Title(s) |
|---|---|
| Joel Lehman | President, Director |
| Bennet Yanowitz | Secretary |
| Earl Moore | Assistant Secretary |
| Martin Elrad | Director |
| David Kahan | Director |
| Marva Lehman | Director |

**2. Management during Chapter 11 case**:  The Managers of the Debtor during the pendency of the Debtor's chapter 11 case are (and will be):

| Name | Title(s) |
| --- | --- |
| Joel Lehman | President, Director |
| Soneet Kapila | Chief Restructuring Officer |
| Bennet Yanowitz | Secretary |
| Earl Moore | Assistant Secretary |
| Martin Elrad | Director |
| David Kahan | Director |
| Marva Lehman | Director |

**3. Management Post-Confirmation of the Plan**: After the Effective Date of the Order confirming the Debtor's Plan, the directors and officers of the Debtor will be the same as during the pendency of the Chapter 11 case, as set forth in detail above.

**D.     Events Leading to Chapter 11 Filing**

Florida Extruders International, Inc. was formed in mid-1989 with 18 employees, facilities totaling 140,000 square feet, all products purchased from outside suppliers and a unique mill direct distribution business selling to pool enclosure specialty contractors statewide. Although the market did not need another stocking distributor at that time, end users perceived that the ability to buy directly from an integrated aluminum extruder located in their state offering warehousing service would realize cost and controlled quality benefits.  Improved extruded and assembled products manufactured by the company such as an extruded gutter with enhanced rain carrying capacity and a higher quality screen door design were introduced. Accessories were also added to the product line for those that preferred buying from a single source. FEI had begun its evolution as a major supplier to a mature industry.

When the company was organized in 1989 it had a 7" 2200-ton extrusion press. This equipment became operational in 1991 after an extensive renovation. At the same time, FEI started its environmentally-friendly powder coating line and began to market a superior product compared to its competition that purchased liquid painted products from an outside supplier. This led to the company becoming known as an industry leader in metal finishing.  After a couple of recessionary years, a 6" 1200-ton extrusion press was added in 1992 to provide needed capacity to meet its planned growth.  By 1995, FEI was not only selling to the contractor but had also penetrated the stocking distributor market segment.  By selling to its competitors, the company gained significantly more market share and a visible market presence second to none. Revenues in 1989 were $2,800,000 and reached $24,600,000 in 1995 under the expanded initial business model.

Since the company's inception, the focus had been to provide products primarily to the construction industry.  In 1995, a new and very successful era began as FEI started shipping

aluminum windows and sliding glass doors under the trade name Milestone®. These were more volume-oriented, high value-added engineered and assembled manufactured products. The company became the second largest manufacturer of these products in Florida and was recognized nationally by the industry numerous times as one of the largest residential window producers in the country.

Over the next ten years, FEI underwent a vast expansion program that included: (1) opening its recycling foundry; (2) building a 200,000 square-foot facility on ten acres for window production and additional warehousing capacity; (3) installing an advanced powder coating line; (4) installing an 8" 2300-ton extrusion press in 1999; (5) opening nine regional building products distribution centers in strategic locations around the state; (6) purchasing 35 acres nearby with the intent to build facilities totaling approximating 500,000 square feet to support projected growth; and (7) leasing 150,000 square feet off premise for additional warehousing space so existing production facilities could be better utilized to meet the anticipated burgeoning demand in each of its businesses. Total revenue in 2005 reached $124,500,000, and the Debtor had just under 1,000 employees. The window business accounted for $78,100,000 or 63% of these sales.

While the company realized only a slight downturn in revenue to $118,900,000 in 2006, the second half was far worse than the first half. As the residential home building industry in Florida collapsed, by 2010 revenues had plummeted by 74% to $30,600,000.

A chain of events, including market conditions, financial issues and inadequate supply leading up to Chapter 11 filing are as follows:

- Chinese imports of aluminum extrusions caused market disruptions in Florida. Since 2005, this affected all of the markets FEI served resulting in sales and margin erosion resulting in unfilled capacity. In particular, patio extrusions sold to distributors in 2000 were $19,900,000 or 68% of the total. In 2005, sales to this market had declined by 49% to $10,195,000 or only 24% of the total sales of this product line.

- The new residential housing industry has been decimated by excessive inventory caused by mortgage defaults, short sales, and much lower appraisals resulting in lower selling prices of existing homes.

- The state of the housing market and the buying pressures exerted by financially-troubled builders resulted in lower window selling prices although the company had incurred uncontrollable increases in material and operating costs that it could not recover.

- Florida has progressively changed its energy code to higher performance standards resulting in many of the national and regional production builders opting for vinyl windows.

- The commercial building market has been affected by the inability to get adequate lending as larger projects have been delayed and cancelled.

- The home improvement industry was harmed by changes in consumer credit ratings and manufacturers of certain items eliminating inventory financing arrangements to their dealers.

- All FEI distribution centers were closed as of December 2009. It was determined that due to the state of the industry that they were too costly to continue to operate.

- High unemployment affected disposable income needed to purchase goods and services to stimulate a weakened economy.

- Suppliers were also affected by the declining economy and market conditions causing them to reduce their credit terms and restrict customer purchases.

- Many of the company's customers have slowed their payments, gone out of business or just refuse to pay contributing to the company's severe cash flow problem.

- As a result of the adverse conditions FEI has been unable to obtain adequate funding to pay its suppliers within their terms. It has also affected the company's ability to purchase materials to meet their customer's production requirements.

- Not withstanding the closing of the window business in February 2011 and all of the factors listed above, it needs to be noted that FEI developed new products, attempted to penetrate new markets and purchased additional high speed equipment to achieve cost reductions and production efficiencies. Taking this into account, the company has shown an increase in capitalized fixed assets of $17,000,000 over the last seven years.

- It turned out that the business could not sustain the unexpected severe downturn that was to come. These capital investments and development activities included: (1) automated insulated glass equipment; (2) a tempered glass production line; (3) a new engineered commercial window product line that received both Florida and Metro-Dade approvals but the demand and the inability to fund its marketing both dried up; (4) purchasing hundreds of standard industrial shape dies including various angles, bars, channels, pipe and tubes as well as complimentary material such as sheet products and then inventorying them in a multitude of stocking units to service a broad range of large and small users that were sold at the distribution centers; (5) an ornamental aluminum fencing business that had much promise but could not reach its potential due to the state of the economy causing the company to discontinue it in March 2011; and (6) a fourth and larger 9" 3000-ton extrusion press with upwards of 40% more production capacity than the other three extrusion presses combined and that would also fill a supply void resulting in a significant increase in the sales and value of the company; however, the installation could not be completed due to lack of funding.

At the present time, the Debtor's level of debt is currently unsustainable and the Debtor has been unable to restructure its debts outside of bankruptcy. With the cooperation of the Debtor's largest secured creditor, Wells Fargo Bank (who will fund operating shortfalls), the Debtor will

quickly submit a liquidating plan to sell all or substantially all of its assets to the highest bidder on a going concern basis through the Chapter 11 process. The Debtor believes this sale will ultimately provide all parties in interest significantly more through its plan of reorganization than they would otherwise realize in the event of a liquidation.

### E.     Significant Events During the Bankruptcy Case

This Bankruptcy Case was filed on April 25, 2011. Since the Petition Date, the Debtor obtained Debtor-In-Possession financing from Wells Fargo Bank that grants Wells Fargo a lien upon substantially all of the Debtor's assets and a super-priority administrative expense claim against the Debtor's estate.

### F.     Projected Recovery of Avoidable Transfers

The Debtor will undertake an extensive analysis of preference, fraudulent conveyance, or other avoidance actions following the filing of the Plan and Disclosure Statement. Since the Debtor has not yet completed its investigation with regard to prepetition transactions, if you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

### G.     Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in <u>Article V</u> of the Plan.

### H.     Current and Historical Financial Conditions

The identity and liquidation value of the Debtor's estate's assets expected at confirmation are listed in **<u>Exhibit B</u>** to this Disclosure Statement.

Attached as **Exhibit C** to this Disclosure Statement are historical financial statements prepared by the Debtor (unaudited) for the period from January 1, 2009 through December 31, 2010 and for the period January 1, 2011 through February 28, 2011.

## III.   SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.   What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.   Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object, if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1.   **Administrative Expenses** - Administrative Expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a) (2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated **Administrative Expenses**, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After Petition Date | None | Paid in full on the Effective Date of the Plan, or as otherwise agreed by the parties. |
| Professional Fees, as approved by the Court. | $450,000.00<br><br>(Triton Capital $400,000, Kapila & Company $25,000 and | Paid in full on the Effective Date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the Effective Date of the Plan. |

| | MPT Firm $25,000) | |
|---|---|---|
| Clerk's Office Fees | Paid as come due | Paid in full on the Effective Date of the Plan |
| Other administrative expenses – cure obligations on lease and franchise agreement | $15,000 | Paid in full on the Effective Date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | $23,400 | Paid in full on the Effective Date of the Plan |
| TOTAL | $488,400 | |

2.    **Priority tax claims** - Priority tax claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, the claimant must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

C.    **Classes of Claims and Equity Interests**

The following are the **classes** set forth in the Plan, and the proposed treatment that they will receive under the Plan:

Class 1        All allowed claims entitled to priority under § 507 of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)).

Class 2        The claim of <u>Ray Valdez, Seminole County Tax Collector</u>, to the extent allowed as a secured claim under § 506 of the Code.

Class 3        The claims of <u>Wells Fargo</u>, as set forth in the Final Order (I) Authorizing Debtor to Use Cash Collateral, (II) Authorizing Debtor to Obtain Post-Petition Financing On a Superpriority, Secured and Priming Basis, (III) Modifying the Automatic Stay, (IV) Approving Soneet R. Kapila as Chief Restructuring Officer, (V) Granting Interim Relief, and (VI) Scheduling A Final Hearing entered on May 31, 2011 (Doc. No. 88) (the **"Cash Collateral Order"**) include the following claims:

The Pre-Petition Secured Claims.  The "**Pre-Petition Secured Claims**" shall mean and include (i) a Revolving Line of Credit dated May 19, 2008, in the original principal amount of $10,000,000, (ii) a Real Estate Term Loan dated July 10, 2007, in the original principal amount of $4,155,933.63, (iii) an Equipment Guidance Line Loan dated March 18, 2005, in the original principal amount of $10,000,000, (iv) a $598,285.22 outstanding letter of credit issued by Wells Fargo at the request of the Debtor as Applicant in favor of Liberty Mutual Insurance

Company as Beneficiary (the **"Letter of Credit"**), and (v) an interest rate swap transaction with reference number 1724698 evidenced by a Swap Transaction Confirmation dated February 1, 2008, part of and subject to the ISDA Master Agreement and Schedule thereto dated January 30, 2008 (the **"Swap Agreement"**) with a determined early termination fee of $161,600 (collectively, the **"Pre-Petition Loans"**). The Pre-Petition Loans are valid, binding, obligations unconditionally owing by the Debtor to Wells Fargo, without offset, defense or counterclaim of any kind, nature and description whatsoever. As of the Petition Date, the outstanding principal and accrued, but unpaid, interest owed to Wells Fargo under the Pre-Petition Loans was approximately $12,900,000, including a contingent liability under the Letter of Credit. The Pre-Petition Loans are secured by perfected, valid, binding and non-avoidable first priority liens and security interests, not subject to any offset, defense or counterclaim, on all of the Debtor's real property (except for the 2305 Beardall Property (as defined below), the Airport Blvd. real property and the real property located at 2650 Jewett Lane, both as set forth on the Debtor's Schedule A filed in this Case) and all of the personal property used in the Debtor's business (collectively, the **"Wells Fargo Pre-Petition Collateral"**). In addition, the Pre-Petition Loans are secured by first priority liens on the Debtor's post-petition cash, accounts receivable and cash equivalents (the **"Wells Fargo Pre-Petition Replacement Liens"**).

The DIP Financing Secured Claims. The **"DIP Financing Secured Claims"** shall mean and include all amounts owing under the DIP Financing. The DIP Financing Secured Claims are valid, binding, obligations unconditionally owing by the Debtor to Wells Fargo, without offset, defense or counterclaim of any kind, nature and description whatsoever. As of the filing of this Plan, the amount owed under the DIP Financing Secured Claims exceeds $1,508,211. The DIP Financing Secured Claims are secured by perfected, valid, binding and non-avoidable first priority liens and security interests, not subject to any offset, defense or counterclaim, subject only to valid perfected liens of governmental units for unpaid property taxes on all of the Debtor's real property (except the 2305 Beardall Property) and all of the personal property used in the Debtor's business (collectively, the **"DIP Financing Collateral"**).

The Super-Priority Claims. The **"Super-Priority Administrative Claims"** shall mean and include obligations of the Debtor arising under the DIP Financing. Pursuant to the Cash Collateral Order, the claims of Wells Fargo arising under the DIP Loan Agreement (as defined in the Cash Collateral Order) have priority over any and all administrative expenses and all other claims, except the claims of a Chapter 7 trustee.

Class 4     The claim of <u>Hunter Douglas</u>, to the extent allowed as a secured claim under § 506 of the Code. Hunter Douglas is secured by a valid, perfected, and enforceable lien that is prior in dignity to all security interests other than the Class 2 Secured Claims on the real property located at 2305 Beardall Ave., Seminole County, FL (the **"2305 Beardall Property"**).

Class 5        The claim of <u>First Insurance Funding Corp.</u>, to the extent allowed as a secured claim under § 506 of the Code. First Insurance Funding Corp. claims a lien on return premiums, dividend payments, and certain loss payments with respect to the financing of property and auto insurance policies with Zurich American Insurance Co. and general liability and umbrella policies with Chartis Specialty Insurance Co.

Class 6        All unsecured claims allowed under § 502 of the Code.

Class 7        Equity interests of the Debtor.

The following sets forth the Plan treatment of Classes 1-7:

**Class 1 - Priority Claims**. Unimpaired.

Class 1 is unimpaired by this Plan, and each holder of an allowed Class 1 Priority Claim will be paid in full, in cash, on the later of (i) 30 days after the Effective Date or (ii) 14 days after the entry of a final non-appealable order allowing the claim if a timely objection thereto is filed.

**Class 2 – Ray Valdez, Seminole County Tax Collector**. Unimpaired.

*Lien on all real and tangible personal property*

The Secured Claims of the Seminole County Tax Collector for real and personal property identified as Claims #1-16 filed in this Case will be paid in full within 30 days of the Effective Date from the net proceeds of the sale of the Assets.

Claims 17 and 18 will not be paid under this Plan. The real property collateral related to Claims 17 and 18 will be surrendered to Hunter Douglas, the Class 4 Secured Creditor as described below.

**Class 3 – Wells Fargo Bank, N.A**. Impaired.

*Pre-Petition Secured Claims, DIP Financing Secured Claims, Super-Priority Administrative Claims*

Except to the extent previously distributed to Wells Fargo pursuant to the Final Sale Order and subject to the "Carve-Outs" described below, the net proceeds from the sale of the Assets remaining following payment of, or provision for, the Class 2 Secured Creditor Claims, as provided herein above, and the Excluded Assets or the proceeds thereof (except for the 2305 Beardall Property) will be distributed as follows:

1. First, to Wells Fargo to satisfy its Pre-Petition Secured Claims;
2. Second, to Wells Fargo to satisfy its DIP Financing Secured Claims; and
3. Third, to Wells Fargo to satisfy its Super-Priority Claims.

Wells Fargo agrees to a carve-out from the distribution set forth above an amount up to $250,000 plus 2% of each dollar that the final Purchase Price for the assets exceeds $8,000,000 to be distributed for the benefit of the Class 6 General Unsecured Creditors (excluding any unsecured deficiency claim of Wells Fargo) (the "**Guaranteed Distribution**").

Wells Fargo agrees to an additional carve-out from the distribution set forth above in the amount of $15,000 to be distributed to Counsel for the Committee of Unsecured Creditors ("**Committee Counsel**") toward fees and costs of Committee Counsel allowed as an administrative expense in this Case (the "**Fee Carve-Out**").

Finally, Wells Fargo agrees to a carve-out for (i) the estimated fees of the U. S. Trustee resulting from the distribution to be made pursuant to this Plan, (ii) the fees and expenses of Soneet R. Kapila, as the CRO and Distribution Agent, and his professionals and (iii) other reasonable costs required to complete the liquidation and dissolution of the Debtor pursuant to this Plan in an amount to be proposed by the CRO in a "shut-down budget," subject to the approval of Wells Fargo, in its sole and absolute discretion (the "**Shut-Down Reserve Carve-Out**"). The Guaranteed Distribution, the Fee Carve-Out and the Shut-Down Reserve Carve-Out shall be treated as additional advances under the DIP Financing by Wells Fargo Bank.

On the Effective Date, the Debtor shall transfer to Wells Fargo the life insurance policy on Joel Lehman (Prudential Life Policy # 77-936-740).

With respect to any fraudulent transfer or other claims of the Estate against Joel Lehman or any other shareholder of the Debtor, Wells Fargo agrees to subordinate its Class 3 Secured Claim to the Class 6 General Unsecured Creditors.

To the extent the Class 3 Secured Claim exceeds the total distributions made to Wells Fargo Bank herein, the excess amount shall be treated as an allowed Class 6 General Unsecured Claim.

### Class 4 – Hunter Douglas.  Impaired.

*1st Lien on real property located at 2305 Beardall Property*

The Debtor will surrender the real property collateral securing the Class 4 Secured Claim, subject to the Class 2 Secured Claims and Liens, to the Class 4 Claimant in full satisfaction of the Class 4 Claimant's Claim. The value of the Class 4 Secured Claimant's Collateral is agreed to be equal to the allowed amount of the Class 4 Claim.

### Class 5 – First Insurance Funding Corp.  Impaired.

*2nd Lien on certain insurance related derivatives*

The Class 5 Secured Claim of First Insurance Funding Corp. shall be allowed in its entire amount as a Class 6 General Unsecured Claim.

The Class 5 Secured Claim is junior to the claims of the Class 2 and Class 3 Secured Claims and the Debtor does not believe the any value exists in the collateral securing the Class 5 Secured Claim.

**Class 6 – General Unsecured Creditors**.  Impaired.

The allowed amount of the Class 6 General Unsecured Creditors' Claims will be paid on a pro rata basis from the following:

1. The assets of the Debtor's estate or the proceeds thereof remaining following payment in full of administrative and priority claims, and payment of the Class 1-5 Secured Creditor Claims described above; plus
2. The **Guaranteed Distribution** in the amount of $250,000 plus 2% of each dollar that the final purchase Price for the Assets exceeds $8,000,000 less the amount distributed or to be distributed to Class 6 Creditors pursuant to paragraph 1 above,  subject to reduction for excess fees and costs of Committee Counsel as described below.

To the extent that the allowed fees and costs of Committee Counsel exceed $15,000, the excess amount shall be paid to Committee Counsel from the Guaranteed Distribution.

Wells Fargo agrees to subordinate any allowed unsecured deficiency claim to the claims of the remaining Class 6 General Unsecured Creditors to the extent of an amount equal to the Guaranteed Distribution.  Wells Fargo Bank will participate pari passu on any other distributions to the Class 6 General Unsecured Creditors with respect to the allowed amount of its unsecured deficiency claim.

Joel Lehman agrees to subordinate his unsecured claim to the claims of the Class 6 General Unsecured Creditors.

**Class 7 - Equity Security Holders of the Debtor**.  Impaired.

All existing equity shall be deemed of no value.  The CRO shall be authorized to take the necessary steps and actions to obtain a final decree dissolving the Post Confirmation Debtor.

D.     **Means of Implementing the Plan**

The hearing on the approval of the Debtor's Disclosure Statement and Plan of Reorganization shall be combined, and the Debtor anticipates that the Plan will be confirmed at a Confirmation Hearing to be held on or around June 30, 2011.

The Debtor's current cash-flow is negative and will require more than $1.1 million to fund its shortfalls through confirmation.  The Debtor has secured a DIP Financing from Wells Fargo, to permit it to meet its financial obligations through confirmation.

The Debtor will have an auction and shall sell the Assets pursuant to the APA (assets not sold under the APA shall be referred to as the "**Excluded Assets**").  After completion of the auction process, the Debtor's CRO, Soneet Kapila, will act as "**Distribution Agent**," and will work with Debtor's counsel to (i) distribute the net proceeds from the sale of the Assets pursuant to this Plan, (ii) sell, transfer, or otherwise monetize and distribute the Excluded Assets of the Debtor pursuant to this Plan, and (iii) object to claims, pursue avoidance actions, and take steps necessary to wind up the Debtor's affairs.  The Debtor anticipates satisfying its administrative expense and priority claims from funds provided by the DIP Financing, the Guaranteed Distribution, the Fee Carve-Out and the Shut-Down Reserve Carve-Out.

**Auction Bid Procedures.**  The Bidding Procedures attached as Exhibit I to the Bid Procedures Order shall apply with respect to the sale of the Assets.

**Assets to be Sold and Excluded from Sale.**  The Assets sold shall include substantially all of the operating assets of the Debtor's estate as more fully described in the APA and the Schedules attached thereto, and specifically excluding, among other assets, claims arising under Chapter 5 of the United States Bankruptcy Code or Chapters 726, or 607 of the Florida Statutes (or the comparable law of other jurisdictions).  Such claims shall be retained and prosecuted by counsel for the Debtor.

**Finding of Good Faith (11 U.S.C. §363(m)).**  The Debtor shall request a finding that the Purchaser acquired the assets in good faith and should be afforded the protections of 11 U.S.C. §363(m).

### E.      Risk Factors

There is **significant risk** to the Debtor's creditors under the proposed Plan, as the Plan payments are to be made from the successful sale of the Assets and recovery of estimated preference claims by counsel for the Unsecured Creditors' Committee.

### F.      Executory Contracts and Unexpired Leases

The Plan, in Section 6.01, lists all executory contracts and unexpired leases that the Purchaser will assume under the Plan.  Assumption means that the Purchaser has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

Consult your adviser or attorney for more specific information about particular contracts or leases.  If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

The Deadline for filing a proof of claim based on a claim arising from the rejection of a lease or contract is 30 days after entry of the Court order granting the Debtor's motion to reject the lease or contract. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

### G. Tax Consequences of Plan

**Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.**

**No analysis of the Federal tax consequences of confirmation of the Plan has been made and you should consult with your own tax expert to determine what, if any, tax consequences may result from confirmation of the Debtor's Plan of Reorganization.**

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in Sections 1129 (a) or (b) of the Bankruptcy Code. Among other things, the requirements include that:

- the Plan must be proposed in good faith;
- at least one impaired class of claims must accept the Plan, without counting votes of insiders;
- the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan;
- and the Plan must be feasible.
- There are also additional requirements for confirmation of a Plan listed in Section 1129.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Certain parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

**In this case, the Plan Proponent believes that the following classes are impaired:**

| Class 3 | -- | **Secured Claim of Wells Fargo Bank** |
|---------|-----|----------------------------------------|
| Class 4 | -- | **Secured Claim of Hunter Douglas** |
| Class 5 | -- | **Secured Claim of First Insurance Funding Corp.** |
| Class 6 | – | **Unsecured Claims** |

**Class 7    –    Equity Interests**

Holders of allowed claims in each of **the impaired classes listed above are entitled to vote** to accept or reject the Plan.

Only a creditor or equity interest holder with an **allowed claim** or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, that creditor or equity interest holder cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case is July 11, 2011** (except as to rejected lease claims, government claims and certain other post petition claims). The Debtor shall have 60 days following entry of the Court's Order confirming the Debtor's Plan to file objections to claims, or such other deadline as the Court may set.

2.      As described above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is **impaired** under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.      The holders of the following five types of claims and equity interests are **not** entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not *"allowed claims"* or *"allowed equity interests"* (as discussed above), unless they have been *"allowed"* for voting purposes.
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
- administrative expense claims.

**Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.**

4.      A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

## B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by ***"cram down"*** on non-accepting classes, as discussed below in Section B.2.

1. A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2. Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a ***"cram down"*** plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a) (8) of the Code, does not ***"discriminate unfairly,"*** and is ***"fair and equitable"*** toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

## C. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. Attached to this Disclosure Statement as **<u>Exhibit B</u>** is a chart of the liquidation value of the material assets of the Debtor.

## D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan following the sale of the Assets to pay all the claims and expenses that are entitled to be paid on that date. The Debtor must also show that it will have enough cash over the life of the Plan to make the required future Plan payments, if any, and operate without future

reorganization. The Debtor has provided such payments through the Shut-Down Reserve Carve-Out.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge of Debt

Except as otherwise expressly provided in the Plan or in the confirmation order, the confirmation order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date of the Plan, of any and all debts of, and claims of any nature whatsoever against the Debtor that arose at any time prior to the confirmation date, including any and all claims for principal and interest, whether accrued before, on or after the Petition Date.

### B. Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new Disclosure Statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the reorganized Debtor, or such other party as the Court shall designate in the Plan confirmation order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI. OTHER AMENDED PLAN PROVISIONS

**Revestment of Reorganized Debtor.** On the Effective Date of the Plan, except as otherwise expressly provided in the Plan, the reorganized Debtor shall be revested with all of their assets free and clear of any and all liens, debts, obligations, claims, cure claims, liabilities, equity interests, and all other interests of every kind and nature (except for any permitted encumbrances), and the confirmation order shall so provide.

**Section 1146 Exemption**. Pursuant to Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan or any Plan document, or the re-vesting, transfer, or sale of any real or personal property of, by, or in the Debtor or the reorganized Debtor pursuant to, in

implementation of, or as contemplated by the Plan or any Plan document shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.

**General Causes of Action.** On the Effective Date, the Reorganized Debtor shall retain all causes of action, except to the extent a creditor or other third party has been specifically released from any cause of action that the estate may have by the terms of the Plan or by Bankruptcy Court order. Neither a vote to accept the Plan by any creditor nor the entry of the confirmation order will result in the waiver or release of any of the estate's causes of action against such creditor. Confirmation of the Plan and entry of the confirmation order are not intended to and shall not be deemed to have any *res judicata* or other effect which would preclude or inhibit prosecution of such causes of action following confirmation of the Plan, whether specified in this Plan or otherwise.

**Settlement of Causes of Action.** The reorganized Debtor may settle any cause of action with the approval of the Bankruptcy Court.

**Adversary Proceeding(s).** In the event that an adversary proceeding is filed against the Debtor, such shall be deemed dismissed with prejudice on the effective date of the Plan, with each party to bear its own costs and attorney's fees in conjunction with such proceeding. All issues and controversies shall be deemed fully settled and resolved upon confirmation, with each of such parties having fully released each other from any and all claims and defenses whatsoever in conjunction with their claims, other than as specifically set forth in this Plan, or the order confirming the Plan.

**Dismissal of Lawsuits.** All lawsuits filed against the Debtor shall be deemed dismissed with prejudice on the Effective Date, with each party to bear its own costs and attorney's fees in conjunction with such lawsuits. All issues and controversies shall be deemed fully settled and resolved upon confirmation, with each of such parties having fully released each other from any and all claims and defenses whatsoever, other than as specifically set forth in this Plan, or the order confirming the Plan.

## VII.        PROVISIONS GOVERNING DISTRIBUTIONS

**Distributions.** Each holder of an allowed claim shall be paid as provided by the Plan; provided however, that if, on any distribution date, any disputed claims remain, then the reorganized Debtor shall withhold payment in respect of any disputed claim until a final order has been entered by the Bankruptcy Court resolving such disputed claim.

**Unclaimed Distributions.**

> (a)        If the holder of an allowed claim fails to negotiate a check issued to such holder within ninety (90) days of the date such check was issued, then the reorganized Debtor shall provide written notice to such holder stating that unless such holder negotiates such check within thirty (30) days of the date of such notice, the amount of cash attributable to such check shall be deemed to be unclaimed, such holder's claim shall no longer be deemed to be allowed, and such holder shall be deemed to have no further claim in respect of such check and shall not participate in any further distributions

under the Plan.

(b)     If a distribution pursuant to the Plan to any holder of an allowed claim is returned to the reorganized Debtor due to an incorrect or incomplete address for the holder of such allowed claim, and no claim is made to the reorganized debtor as to such distribution within one hundred twenty (120) days of the return of such distribution, then the amount of cash attributable to such distribution shall be deemed to be unclaimed and such holder shall be deemed to have no further claim in respect of such distribution and shall not participate in any further distributions under the Plan.

**Transfer of Claim.**  In the event that the holder of any claim shall transfer such claim on and after the Effective Date, it shall immediately advise the reorganized Debtor in writing of such transfer.  The reorganized Debtor shall be entitled to assume that no transfer of any claim has been made by any holder unless and until the reorganized Debtor shall have received written notice to the contrary.  Each transferee of any claim shall take such claim subject to the provisions of the Plan and to any request made, waiver or consent given, or other action taken hereunder and, except as otherwise expressly provided in such notice, the reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

**Determination of Claims.**

(a) Following the effective date of the Plan and except as may otherwise be provided herein, the reorganized Debtor shall have standing to and may object to any administrative claim, priority claim, priority tax claim, secured claim, and unsecured claims.  Unless otherwise ordered by the Bankruptcy Court, and except as to any late-filed claims and claims resulting from the rejection of executory contracts or unexpired leases, all objections to claims shall be filed with the Bankruptcy Court on or before sixty (60) days following the effective date (unless such period is extended by the Bankruptcy Court upon motion of the reorganized Debtor), and the confirmation order shall contain appropriate language to that effect.

(b) Disputed claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. §157(b)(2)(B) unless the Bankruptcy Court orders otherwise.  If the fixing or liquidation of a contingent or unliquidated claim would cause undue delay in the administration of the reorganization case, such claim shall be estimated by the Bankruptcy Court for purposes of allowance and distribution.  Upon receipt of a timely-filed Proof of Claim, the Debtor or other party in interest may file a request for estimation along with its objection to the claim set forth therein.  The determination of claims in estimation hearings shall be binding for purposes of establishing the maximum amount of the claim for purposes of allowance and distribution.  Procedures for specific estimation hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the disputed claim.

**De Minimis Distributions on Account of Allowed Claims.**    To avoid the disproportionate expense and inconvenience associated with making distributions in amounts of less than ten dollars ($10.00) each with respect to allowed claims, the reorganized Debtor shall not be required to make, and shall be excused from making, distributions in amounts of less than

$10.00 each to holders of allowed claims.

## VIII.   CONDITIONS PRECEDENT

**Condition Precedent to Confirmation of the Plan.**   The Bankruptcy Court shall not enter the confirmation order, confirmation of the Plan shall not be effective, and the Debtor shall not be obligated to consummate the Plan, unless the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the confirmation order in a manner consistent with the provisions of the Plan and in form and substance satisfactory to the Debtor.

**Condition Precedent to Effective Date**.   The Plan shall not be consummated and the effective date shall not occur until the Bankruptcy Court has entered the confirmation order, in form and substance satisfactory to the Debtor, on the docket of this case, and no stay of the confirmation order shall be in effect.

**Waiver of Conditions Precedent.**   The Debtor may elect to waive any condition precedent set forth above that has not been satisfied on or before the date of the confirmation hearing.

## IX.   INJUNCTION, EXCULPATION AND RELEASE PROVISIONS

**General Injunction**.   Pursuant to Sections 105, 1123, 1129, and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the confirmation date, except as otherwise provided in the Plan or in the confirmation order, all persons or entities that have held, currently hold or may hold a claim or other debt or liability, that is discharged pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged claims, debts or liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan documents:  (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the reorganized Debtor, or its respective properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the reorganized Debtor, or their assets; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the reorganized Debtor, or their assets; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability or obligation due to the Debtor or the reorganized Debtor; or (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the confirmation order.  The Debtor and the reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation.

**Exculpation from Liability**.   The Debtor, the reorganized Debtor, its respective directors, officers, employees, agents, representatives, accountants, attorneys, and professionals (acting in such capacity), and their respective heirs, executors, administrators, successors, and assigns, will neither have nor incur any liability whatsoever to any person or other entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation,

preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, any Plan document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the reorganization case. The rights granted herein are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the reorganized Debtor, and its respective agents have or obtain pursuant to any provision of the Bankruptcy Code. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.

**Release.** To the extent permitted under the Bankruptcy Code, on the Effective Date of the Plan, the post confirmation Debtor shall be unconditionally and hereby is deemed to be unconditionally released from any and all claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtor, this reorganization case, any assets of the Debtor, the business or operations of the Debtor, the Plan, or any of the transactions contemplated thereby. The confirmation order shall enjoin the prosecution by any person or entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Principals, except as otherwise provided in the Plan, the Plan documents or the Confirmation Order. This release provision is an integral part of the Plan and is essential to its implementation.

The Officers, Directors, the Secured Creditors, the DIP Lender, the Committee, the Purchaser, its officers, directors, employees and agents shall be deemed to be released of any and all claims that may arise caused by the filing of the petition for relief, the sale of the Assets, the confirmation of the Plan, and the liquidation and the winding up of the Debtor's affairs; provided, however nothing contained herein shall act as a release concerning any obligations under the Plan or the APA.

**Release of Joel Lehman.** To the extent permitted under the Bankruptcy Code, on the Effective Date of the Plan, in consideration of Joel Lehman's subordination of his unsecured claim to the claims of the Class 6 general unsecured creditors, Mr. Lehman shall be deemed released from any and all claims of the Estate arising up to and through the Effective Date.

**Term of Certain Injunctions and Automatic Stay.** All injunctions or automatic stays provided for in the reorganization case pursuant to Sections 105, 362, or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the confirmation date, shall remain in full force and effect until the effective date. Any preliminary or permanent injunction entered by the Bankruptcy Court shall continue in full force and effect following the confirmation date and the final decree date, unless otherwise ordered by the Bankruptcy Court.

**No Liability for Tax Claims.** Unless a taxing governmental authority has asserted a claim against the Debtor before the bar date or administrative expense claims bar date established with respect to such claim, no claim of such governmental authority shall be allowed

against the Debtor or the reorganized Debtor for taxes, penalties, interest, additions to tax, or other charges arising out of the failure, if any, of the Debtor, any of his affiliates, or any other person or entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or arising out of an audit of any return for a period before the Petition Date.

**No Liability for Untimely Administrative Expense Claims.** Holders of administrative expense claims (including holders of any claims for post-petition federal, state or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the administrative expense claims bar date shall be forever barred from asserting such administrative expense claims against the Debtor, the reorganized Debtor, or any of its respective properties.

## X.   RETENTION OF JURISDICTION

**General Retention.** Notwithstanding the entry of the confirmation order and the occurrence of the effective date, until the reorganization case is closed, the Bankruptcy Court shall retain the most full and extensive jurisdiction of the reorganization case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

**Specific Purposes.** In addition to the general retention of jurisdiction set forth in this Plan, after confirmation of the Plan and until the reorganization case is closed, the Bankruptcy Court shall retain jurisdiction of the reorganization case for the following specific purposes:

(a) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any claim or equity interest, including the resolution of any application for an administrative expense, and to determine any and all objections to the allowance or priority of claims or equity interests;

(b) to determine any and all cases, controversies, suits or disputes arising under or relating to the Plan or the confirmation order (including regarding the effect of any release, discharge, or injunction provisions provided for herein or affected hereby and regarding whether conditions to the consummation and/or effective date of the Plan have been satisfied) and to enforce the obligations under the Plan;

(c) to determine any and all applications for allowance of compensation of professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the reorganization case; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of professionals after confirmation of the Plan unless an objection to such fees and expenses has been made by the Debtor or the reorganized Debtor;

(d) to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption or assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable (including assumed contracts), and to determine the allowance of any claims resulting from the rejection thereof or any amount necessary to cure defaults in any assumed

and/or assigned executory contracts or unexpired leases (including assumed contracts), including cure claims;

(e) to determine any and all motions, applications, adversary proceedings, contested or litigated matters, causes of action, and any other matters involving the Debtor or the reorganized Debtor commenced in connection with, or arising during, the reorganization case and pending on the Effective Date, including approval of proposed settlements thereof;

(f) to enforce, interpret, and administer the terms and provisions of the Plan and the Plan documents;

(g) to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

(h) to consider and act on the compromise and settlement of any claim against or equity interest in the Debtor or the estate;

(i) to assure the performance by the reorganized Debtor of its obligations to make distributions under the Plan;

(j) to correct any defect, cure any omission, reconcile any inconsistency, and make any other necessary change or modification in or to the Disclosure Statement, the Plan, the Plan documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the effective date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(k) to resolve any disputes concerning any release of a nondebtor hereunder or the injunction against acts, employment of process, or actions against such nondebtor arising hereunder;

(l) to enforce all orders, judgments, injunctions, and rulings entered in connection with this reorganization case;

(m) to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement (if required), or the confirmation order, including the Plan documents;

(n) to review and approve any sale or transfer of assets or property by the Debtor or the reorganized Debtor, including prior to or after the date of the Plan, and determine all questions and disputes regarding such sales or transfers;

(o) to determine all questions and disputes regarding title to the assets of the Debtor, the estate, or the reorganized Debtor;

(p) to determine any motions or contested matters relating to the causes of action,

whether brought before or after the effective date;

(q)    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor arising on or prior to the effective date or arising on account of transactions contemplated by the Plan;

(r)    to resolve any determinations which may be requested by the Debtor or the reorganized Debtor of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146(d) of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the effective date;

(s)    to issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person or entity with consummation, implementation or enforcement of the Plan or the confirmation order;

(t)    to enter and implement such orders as are necessary or appropriate if the confirmation order is for any reason modified, stayed, reversed, revoked, or vacated;

(u)    to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement (if required), the confirmation order, or the Plan documents;

(v)    to enter such orders as are necessary to implement and enforce the injunctions described herein;

(w)    to determine such other matters and for such other purposes as may be provided for in the confirmation order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

(x)    to enter an order concluding and terminating the reorganization case.

**Closing of the Reorganization Case.**  In addition to the retention of jurisdiction set forth above, the Bankruptcy Court shall retain jurisdiction of the reorganization case to enter an order reopening the reorganization case after it has been closed.

## XI.    MISCELLANEOUS PROVISIONS

**No Admissions.**  The Plan provides for the resolution, settlement and compromise of claims against and equity interests in the Debtor.  Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

**Revocation or Withdrawal of the Plan.**  The Debtor reserves the right to revoke or withdraw the Plan prior to the confirmation date.  If the Debtor revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any claims by or against, or equity interests in, the Debtor or any other person, or (b) prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**Settlement of Claims.**  The reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any claim or cause of action which the Debtor in possession had or had power to assert immediately prior to the confirmation date, and (b) may settle or adjust such claim or cause of action.

**Standard for Approval by the Bankruptcy Court.**  In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 Debtor in possession.

**Further Assurances.**  The Debtor or the reorganized Debtor (as the case may be) agrees and is authorized to execute and deliver any and all papers, documents, contracts, agreements, and instruments that may be necessary to carry out and implement the terms and conditions of the Plan.

**Headings.**  The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

**Notices.**  All notices, requests, or other documents in connection with or required to be served by the Plan shall be in writing and shall be sent by first class United States mail, postage prepaid, or by overnight delivery by a recognized courier service, to:

If to the Debtor or the Reorganized Debtor:

Florida Extruders, Inc.
2540 Jewett Lane
Sanford, FL 32771
Attn: Soneet R. Kapila, CRO

with a mandatory copy to:

McIntyre, Panzarella, Thanasides,
    Hoffman, Bringgold & Todd, P. L.
Attn: Christopher C. Todd
400 N. Ashley St., Suite 1500
Tampa, Florida, 33602

**Contemporaneous Service.**  Copies of all notices under the Plan to any party shall be given to the Debtor and the reorganized Debtor and its counsel, contemporaneously with the giving of notice to such party.

**Changes of Address.**  Any entity may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court and serving same on the parties set forth above.

**Governing Law.**  Except to the extent that federal law (including the Bankruptcy Code

or the Bankruptcy Rules) is applicable, or to the extent that the Plan or the provision of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof.

**Limitation of Allowance.** No attorneys' fees, punitive damages, penalties, special damages, lost profits, treble damages, exemplary damages, or interest shall be paid with respect to any claim or equity interest except as specified herein or as allowed by a Final Order of the Bankruptcy Court.

**Estimated Claims.** To the extent any Claim is estimated for any purpose other than for voting, then in no event shall such Claim be allowed in an amount greater than the estimated amount.

**Consent to Jurisdiction.** Upon any default under the Plan, the Debtor and the reorganized Debtor consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default. By accepting any distribution or payment under or in connection with the Plan, by filing any Proof of Claim, by filing any cure claim, by voting on the Plan, or by entering an appearance in the reorganization case, all creditors and other parties in interest, including foreign creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the reorganization case, including the matters and purposes set forth in this Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in this Plan.

**Setoffs.** Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Debtor may, but shall not be required to, set off against any claim and the payments or other distributions to be made pursuant to the Plan in respect of such claim, claims of any nature whatsoever the Debtor may have against the holder of such claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such holder.

**Successors and Assigns.** The rights, benefits, duties, and obligations of any person named or referred to in the Plan shall be binding upon and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such person.

**No Postpetition Interest.** Except as expressly stated in the Plan or otherwise allowed by a Final Order of the Bankruptcy Court, no holder of an allowed claim shall be entitled to the accrual of postpetition interest or the payment of postpetition interest, penalties, or late charges on account of such claim for any purpose.

**Modification of Payment Terms.** The reorganized Debtor reserves the right to modify the treatment of any allowed claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the effective date, upon the consent of the holder of such allowed claim.

**Entire Agreement.** The Plan and Plan documents set forth the entire agreement and

undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**Severability of Plan Provisions.** If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The confirmation order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Confirmation Order and Plan Control.** To the extent the confirmation order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any third party, unless otherwise expressly provided in the Plan, the Plan controls the Disclosure Statement and any such agreements, and the confirmation order (any and other orders of the Court) shall be construed together and consistent with the terms of the Plan.

**Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

*[SIGNATURE PAGE FOLLOWS]*

FLORIDA EXTRUDERS, INC.

By: _____
    Soncet R. Kapila, Chief Restructuring Officer

30

**INDEX OF EXHIBITS**

EXHIBIT A-- Form Ballot

EXHIBIT B -- Identity and Liquidation Value of Material Assets of Debtor

EXHIBIT C – Financial Statements for the period from January 1, 2009 through December 31, 2010 and for the period January 1, 2011 through February 28, 2011

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

Case No.: 8:11-bk-07761-KRM
Florida Extruders International, Inc.                    Chapter 11

 Debtor.

_____/

**BALLOT FOR ACCEPTING OR REJECTING DEBTOR'S**
**PLAN OF REORGANIZATION**

 The Plan of Reorganization (the "Plan") referred to in this Ballot, may be confirmed by the Court and hereby made binding on you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class and the holders of two-thirds in amount of equity security interests in each class voting on the Plan. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of § 1129(b) of the Bankruptcy Code. To have your vote count, you must complete, **SIGN**, and return this ballot.

---

Name of Creditor:_____Sample

Amount of Claim $_____Class:
▬

The undersigned, a creditor of the above-named Debtor in the unpaid principal amount listed above,

 ☐     Accepts                    ☐
Rejects
**FLORIDA EXTRUDERS, INC.'S Plan of Reorganization.**

---

Signed: _____

Print or Type Name: _____

Title: _____

Name of Company: _____

Address: _____

| This ballot must be received on or before _____ at the following address: | A **copy** of this ballot is to be sent to: |
|---|---|
| **Clerk, United States Bankruptcy Court**<br>Sam M. Gibbons Courthouse<br>801 North Florida Avenue, Suite 727<br>Tampa, Florida 33602-3826 | Richard J. McIntyre, Esquire<br>**McIntyre, Panzarella, Thanasides,<br>  Hoffman, Bringgold & Todd, P.L.**<br>400 N. Ashley St., Suite 1500<br>Tampa, FL 33602<br>**ATTORNEYS FOR DEBTOR** |

**Exhibit B**

Identity and Liquidation Value of Material Assets of Debtor

| Schedule and Item # | Description | Scheduled Value as of 4/25 | Approximate Book Value as of 5/31 | Estimated Liquidated Recovery % | Estimated Liquidation Value |
|---|---|---|---|---|---|
| B-2 | Checking | | 358,991 | 100% | 358,991 |
| B-3 | Deposits (less setoffs) | 259,117 | 376,677 | 100% | 376,677 |
| B-9 | Prudential Life Policy # 77-936-740 | 667,332 | 667,332 | 100% | 667,332 |
| B-15 | Secured Note Receivable | 158,000 | 158,000 | 100% | 158,000 |
| B-16 | Trade Receivables | 3,207,858 | 3,036,822 | 33% | 1,002,151 |
| B-18 | Judgments | 1,611,198 | 1,611,198 | 25% | 402,800 |
| B-21 | Expected Judgment(s) | 10,000 | 10,000 | 50% | 5,000 |
| B-25 | Rolling Stock | 51,167 | 51,167 | 50% | 25,583 |
| B-28 | Office Equipment, Furniture, Supplies | 200,739 | 200,739 | 20% | 40,148 |
| B-29 | Machinery, Fixtures, Equiment | 12,064,772 | 12,064,772 | 20% | 2,412,954 |
| B-30 | Inventory | 2,141,646 | 2,855,544 | 20% | 571,109 |
| B-35 | Environmental Claims | unk | unk | 0% | - |
| Less: | Personal Property Taxes | | | | (103,512) |
| | **Subtotal** | | | | 5,917,234 |
| | **Real Property** | | | | - |
| A | 2601 W. 5th St., PIN # 26-19-30-5AE-8100-0000 | | 5,999,121 | 50% | 2,999,561 |
| Less: | Real Property Taxes | | | | (270,318) |
| | Closing Costs (at 8%) | | | | (239,965) |
| A | 2305 Beardall Ave., PIN# 33-19-31-300-1320-0000 | | 1,803,384 | 50% | 901,692 |
| Less: | Real Property Taxes | | | | (78,088) |
| | Closing Costs (at 8%) | | | | (72,135) |
| | Hunter Douglas Secured Claim | | | | (751,468) |
| A | Airport Blvd. Property, PIN # 26-19-30-5AE-720A-0000 | | 459,722 | 50% | 229,861 |
| Less: | Real Property Taxes | | | | (31,868) |
| | Closing Costs (at 8%) | | | | (18,389) |
| A | 2650 Jewett Lane, PIN # 26-19-30-5AE-700C-0000 | | 1,255,948 | 50% | 627,974 |
| Less: | Real Property Taxes | | | | (66,295) |
| | Closing Costs (at 8%) | | | | (50,238) |
| A | Jewett Lane, PIN # 26-19-30-5AE-800A-0000 | | 1,287,821 | 50% | 643,911 |
| Less: | Real Property Taxes | | | | (62,888) |
| | Closing Costs (at 8%) | | | | (51,513) |
| A | 2600 Jewett Lane, PIN # 26-19-30-5AE-800B-0000 | | 616,951 | 50% | 308,476 |
| Less: | Real Property Taxes | | | | (27,724) |
| | Closing Costs (at 8%) | | | | (24,678) |
| A | Jewett Lane, PIN # 26-19-30-5AE-800E-0000 | | 407,888 | 50% | 203,944 |
| Less: | Real Property Taxes | | | | (20,798) |
| | Closing Costs (at 8%) | | | | (16,316) |
| A | 2540 Jewett Lane, PIN # 26-19-30-5AE-800G-0000 | | 1,343,711 | 50% | 671,856 |
| Less: | Real Property Taxes | | | | (68,872) |
| | Closing Costs (at 8%) | | | | (53,748) |
| | **Subtotal** | | | | 4,682,172 |
| | **PROCEEDS AVAILABLE TO SECURED CLAIMS** | | | $ | 10,599,407 |

| | | | |
|---|---|---|---|
| Less: | Wells Fargo Secured Claims (All personal property and all real property except 2305 Beardall) | | 10,599,407 |
| | Chapter 5 Avoidance Claims Estimate | | 282,000 |
| | **ESTIMATED PROCEEDS FOLLOWING LIQUIDATION EXPENSES AND SECURED CREDITOR DISTRIBUTIONS** | $ | 282,000 |
| | Less: | | |
| | U.S. Trustee Fees | $ | 23,400 |
| | Chapter 7 Trustee Fees and associated disposition fees | | 250,000 |
| | Superpriority Administrative Expense Claim of Wells Fargo | | 8,600 |
| | Administrative Expense Claims | | - |
| | Post Petition Trade Payables | Various | - |
| | Post Petition Accrued Costs | N/A | - |
| | Priority Claims | | - |
| | | | 282,000 |
| | **ESTIMATED PROCEEDS AVAILABLE FOR UNSECURED CREDITORS** | $ | 0 |

**Estimated Unsecured Claims**

| Description | | Amount |
|---|---|---|
| Scheduled Unsecured Creditors (ex-Joel Lehman) | Schedule F | 3,202,110 |
| Unsecured Insider Claim of Joel Lehman | | 4,972,860 |
| Hunter Douglas | | 660,974 |
| Wells Fargo | | 2,874,489 |
| **Total Estimated Unsecured Claims** | | **11,710,433** |
| **Total Estimated Unsecurd Claims (ex-Joel Lehman)** | | **6,737,573** |
| **Total Estimated Unsecured Claims (ex-Joel Lehman and ex-Wells Fargo)** | | **3,863,083** |

**ESTIMATED PERCENT RECOVERY ON UNSECURED CLAIMS IN LIQUIDATION** — 0.00%

> The Plan offers the Unsecured Creditors a guaranteed distribution of $250,000 (assuming that allowed fees for counsel for the General Unsecured Creditors do not exceed $15,000).

**TOTAL MINIMUM AMOUNT TO BE PAID TO UNSECURED CREDITORS UNDER THE PLAN** — $ 250,000

**PERCENT OF CLAIMS WHICH UNSECURED CREDITORS WOULD RECEIVE OR RETAIN UNDER THE PLAN (MINIMUM)** — 6.47%

> =($250,000/$3,863,083)
> Under the terms of the Plan, Joel Lehman agrees to subordinate his entire unsecured claim to the claims of the general unsecured creditors, and Wells Fargo agrees to subordinate any unsecured claim it is allowed to the general unsecureds with respect to the $250,000 guaranteed distribution only.

**Exhibit C**

Financial Statements
For the period
January 1, 2009 through December 31, 2010
and
January 1, 2011 through February 28, 2011

# FLORIDA EXTRUDERS INTERNATIONAL, INC.

|  | 2011 | | | | 2010 | | | |
|---|---|---|---|---|---|---|---|---|
|  | February 2011 | % OF SALES | Y.T.D. 2011 | % OF SALES | February 2010 | % OF SALES | Y.T.D. 2010 | % OF SALES |
| **SALES** | | | | | | | | |
| Net Sales Extrusion/Bldg | 1,135,232 | 68.64% | 2,350,740 | 66.95% | 1,440,026 | 53.87% | 2,684,636 | 49.83% |
| Net Sales Window | 518,774 | 31.36% | 1,160,698 | 33.05% | 1,233,135 | 46.13% | 2,702,603 | 50.17% |
| Total Sales | 1,654,006 | 100.00% | 3,511,439 | 100.00% | 2,673,161 | 100.00% | 5,387,239 | 100.00% |
| **COST OF SALES** | 1,495,577 | 90.42% | 3,120,999 | 88.88% | 1,724,620 | 64.52% | 3,562,224 | 66.12% |
| **MARGIN** | | | | | | | | |
| Extrusion Margin | 106,342 | 9.37% | 255,267 | 10.86% | 292,909 | 20.34% | 502,696 | 18.72% |
| Window Margin | 52,087 | 10.04% | 135,172 | 11.65% | 655,632 | 53.17% | 1,322,320 | 48.93% |
| Total Margin | 158,429 | 9.58% | 390,439 | 11.12% | 948,541 | 35.48% | 1,825,016 | 33.88% |
| Distribution Costs | | | | | | | | |
| Warehouse Costs | 74,692 | 4.52% | 116,902 | 3.33% | 87,793 | 3.28% | 154,591 | 2.87% |
| Delivery Expenses | 60,566 | 3.66% | 139,612 | 3.98% | 138,342 | 5.18% | 265,693 | 4.93% |
| Total | 135,258 | 8.18% | 256,514 | 7.31% | 226,135 | 8.46% | 420,284 | 7.80% |
| **VARIABLE MARGIN** | 23,171 | 1.40% | 133,925 | 3.81% | 722,406 | 27.02% | 1,404,732 | 26.08% |
| **FIXED COSTS** | | | | | | | | |
| Depreciation | 169,800 | 10.27% | 339,600 | 9.67% | 225,000 | 8.42% | 450,000 | 8.35% |
| Maintenance | 15,047 | 0.91% | 28,254 | 0.80% | 27,677 | 1.04% | 46,630 | 0.87% |
| Building Rent | 36,091 | 2.18% | 72,896 | 2.08% | 1,446 | 0.05% | 4,231 | 0.08% |
| Other | 53,758 | 3.25% | 107,516 | 3.06% | 53,699 | 2.01% | 107,457 | 1.99% |
| Total | 274,696 | 16.61% | 548,266 | 15.61% | 307,822 | 11.52% | 608,318 | 11.29% |
| **GROSS MARGIN** | (251,525) | -15.21% | (414,341) | -11.80% | 414,584 | 15.51% | 796,414 | 14.78% |
| **SALES & ADMINISTRATIVE EXPENSES** | | | | | | | | |
| Sales Expenses | 29,200 | 1.77% | 76,152 | 2.17% | 51,991 | 1.94% | 99,448 | 1.85% |
| Administrative Expense | 409,610 | 24.76% | 758,209 | 21.59% | 324,695 | 12.15% | 601,665 | 11.17% |
| Total | 438,810 | 26.53% | 834,361 | 23.76% | 376,686 | 14.09% | 701,113 | 13.01% |
| **OPERATIONAL PROFIT/(LOSS)** | (690,335) | -41.74% | (1,248,702) | -35.56% | 37,898 | 1.42% | 95,301 | 1.77% |
| **OTHER INCOME/(EXPENSE)** | | | | | | | | |
| Other Misc. Income | 22,116 | 1.34% | 25,024 | 0.71% | 153 | 0.01% | 295 | 0.01% |
| Interest Expense | (74,365) | -4.50% | (133,153) | -3.79% | (65,497) | -2.45% | (134,736) | -2.50% |
| Total | (52,249) | -3.16% | (108,129) | -3.08% | (65,344) | -2.44% | (134,441) | -2.50% |
| **PROFIT (LOSS)** | (742,584) | -44.90% | (1,356,831) | -38.64% | (27,446) | -1.03% | (39,140) | -0.73% |

| ASSETS | CURR. MO. | JAN. 1, 2010 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash (Schedule 1) | 1,926 | 1,926 |
| Trade Receivables - Net (Schedule 2) | 3,778,408 | 3,803,577 |
| Notes Receivables | 137,300 | 139,219 |
| Inventory (Schedule 3) | 3,055,042 | 4,425,654 |
| .99¢ Other Current Assets (Schedule 4) | 3,355,580 | 3,287,819 |
| **TOTAL** | 10,328,256 | 11,658,195 |
| **FIXED ASSETS** | | |
| Fixed Assets (Cost) | 56,684,105 | 56,684,105 |
| Accumulated Depreciation | (34,015,467) | (33,675,867) |
| **NET FIXED ASSETS** | 22,668,638 | 23,008,238 |
| **ADVANCED DEPOSITS** | 563,127 | 597,899 |
| **LOAN COSTS - NET** | - | - |
| **CASH SURRENDER VALUE OF LIFE INSURANCE** | 686,670 | 686,670 |
| **TOTAL ASSETS** | 34,246,692 | 35,951,001 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable | 3,905,630 | 4,237,620 |
| Deferred Credits | - | |
| Accrued Expenses (Schedule 8) | 1,559,167 | 1,335,749 |
| **TOTAL CURRENT LIABILITIES** | 5,465,863 | 5,573,369 |
| **NON CURRENT LIABILITIES** | | |
| Bank Loan | 12,079,700 | 12,320,933 |
| Shareholder Loan | 2,747,791 | 2,747,791 |
| JL Additional Loans | 3,088,600 | 3,088,600 |
| | 17,916,091 | 18,157,324 |
| **TOTAL LIABILITIES** | 23,381,954 | 23,730,693 |
| **EQUITY** | | |
| Capital Stock | 500,000 | 500,000 |
| Earnings Year To Date | (1,355,572) | - |
| Shareholder Distributions | (55,519,814) | (55,519,814) |
| Total Earnings | 67,240,123 | 67,240,123 |
| **TOTAL EQUITY** | 19,864,737 | 12,220,309 |
| **TOTAL LIABILITIES & EQUITY** | 34,246,692 | 35,951,002 |

# FLORIDA EXTRUDERS INTERNATIONAL, INC.

| | 2010 | | | | 2009 | | | |
|---|---|---|---|---|---|---|---|---|
| | December 2010 | % OF SALES | Y.T.D. 2010 | % OF SALES | December 2009 | % OF SALES | Y.T.D. 2009 | % OF SALES |
| **SALES** | | | | | | | | |
| Net Sales Extrusion/Bldg | 1,180,466 | 65.45% | 17,382,394 | 56.72% | 1,382,197 | 67.96% | 21,829,014 | 61.39% |
| Net Sales Window | 623,197 | 34.55% | 13,260,980 | 43.28% | 651,501 | 32.04% | 13,729,544 | 38.61% |
| Total Sales | 1,803,663 | 100.00% | 30,643,375 | 100.00% | 2,033,698 | 100.00% | 35,558,559 | 100.00% |
| **COST OF SALES** | 2,660,422 | 147.50% | 25,853,029 | 84.37% | 1,648,293 | 81.05% | 26,637,551 | 74.91% |
| **MARGIN** | | | | | | | | |
| Extrusion Margin | (118,610) | -6.58% | 2,363,988 | 7.71% | 364,990 | 17.95% | 5,556,197 | 15.63% |
| Window Margin | (738,149) | -40.93% | 2,426,357 | 7.92% | 20,415 | 1.00% | 3,364,810 | 9.46% |
| Total Margin | (856,759) | -47.50% | 4,790,345 | 15.63% | 385,405 | 18.95% | 8,921,007 | 25.09% |
| **Distribution Costs** | | | | | | | | |
| Warehouse Costs | 55,142 | 3.06% | 926,490 | 3.02% | 83,902 | 4.13% | 1,015,519 | 2.86% |
| Delivery Expenses | 112,303 | 6.23% | 1,545,236 | 5.04% | 183,119 | 9.00% | 2,065,075 | 5.81% |
| Total | 167,445 | 9.28% | 2,471,726 | 8.07% | 267,021 | 13.13% | 3,080,594 | 8.66% |
| **VARIABLE MARGIN** | (1,024,204) | -56.78% | 2,318,619 | 7.57% | 118,384 | 5.82% | 5,840,413 | 16.42% |
| **FIXED COSTS** | | | | | | | | |
| Depreciation | 189,088 | 10.48% | 2,509,288 | 8.19% | 182,347 | 8.97% | 2,657,347 | 7.47% |
| Maintenance | 16,632 | 0.92% | 213,585 | 0.70% | 17,334 | 0.85% | 281,689 | 0.79% |
| Building Rent | (44,147) | -2.45% | 461,352 | 1.51% | 528,134 | 25.97% | 1,837,641 | 5.17% |
| Other | 53,758 | 2.98% | 647,208 | 2.11% | 68,817 | 3.38% | 693,750 | 1.95% |
| Total | 215,331 | 11.94% | 3,831,433 | 12.50% | 796,632 | 39.17% | 5,470,427 | 15.38% |
| **GROSS MARGIN** | (1,239,535) | -68.72% | (1,512,814) | -4.94% | (678,248) | -33.35% | 369,986 | 1.04% |
| **SALES & ADMINISTRATIVE EXPENSES** | | | | | | | | |
| Sales Expenses | 48,472 | 2.69% | 610,918 | 1.99% | 80,693 | 3.97% | 933,112 | 2.62% |
| Bad Debt Expenses | 296,157 | 16.42% | 722,308 | 2.36% | 631,164 | 31.04% | 631,164 | 1.77% |
| Administrative Expense | 515,811 | 28.60% | 3,840,781 | 12.53% | 676,681 | 33.27% | 4,558,836 | 12.82% |
| Total | 860,440 | 47.71% | 5,174,007 | 16.88% | 1,388,538 | 68.28% | 6,123,112 | 17.22% |
| **OPERATIONAL PROFIT/(LOSS)** | (2,099,975) | -116.43% | (6,686,821) | -21.82% | (2,066,786) | -101.63% | (5,753,126) | -16.18% |
| **OTHER INCOME/(EXPENSE)** | | | | | | | | |
| Other Misc. Income | 168,637 | 9.35% | 291,629 | 0.95% | 365 | 0.02% | 140,840 | 0.40% |
| Interest Expense | (60,120) | -3.33% | (809,501) | -2.64% | (212,571) | -10.45% | (838,563) | -2.36% |
| Total | 108,517 | 6.02% | (517,872) | -1.69% | (212,206) | -10.43% | (697,723) | -1.96% |
| **PROFIT (LOSS)** | (1,991,458) | -110.41% | (7,204,693) | -23.51% | (2,278,992) | -112.06% | (6,450,849) | -18.14% |



FLORIDA EXTRUDERS INTERNATIONAL, INC.
BALANCE SHEET
For 12 Months Ending 12/31/10

| ASSETS | CURR. MO. | JAN. 1, 2010 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash (Schedule 1) | 1,926 | 10,209 |
| Trade Receivables - Net (Schedule 2) | 3,803,577 | 4,730,935 |
| Notes Receivables | 139,219 | 149,771 |
| Inventory (Schedule 3) | 4,425,654 | 8,006,250 |
| Other Current Assets (Schedule 4) | 3,287,819 | 2,820,489 |
| **TOTAL** | 11,658,195 | 15,717,654 |
| **FIXED ASSETS** | | |
| Fixed Assets (Cost) | 56,684,105 | 56,630,556 |
| Accumulated Depreciation | (33,675,867) | (31,229,174) |
| **NET FIXED ASSETS** | 23,008,238 | 25,401,382 |
| **ADVANCED DEPOSITS** | 597,899 | 490,150 |
| **LOAN COSTS - NET** | - | 7,760 |
| **CASH SURRENDER VALUE OF LIFE INSURANCE** | 686,670 | 686,670 |
| **TOTAL ASSETS** | 35,951,002 | 42,303,617 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable | 4,237,620 | 4,665,005 |
| Deferred Credits | | (1,331) |
| Accrued Expenses (Schedule 8) | 1,335,749 | 1,075,206 |
| **TOTAL CURRENT LIABILITIES** | 5,573,369 | 5,738,880 |
| **NON CURRENT LIABILITIES** | | |
| Bank Loan | 12,320,933 | 13,698,345 |
| Shareholder Loan | 2,747,791 | 2,747,791 |
| JL Additional Loans | 3,088,600 | 693,600 |
| | 18,157,324 | 17,139,736 |
| **TOTAL LIABILITIES** | 23,730,693 | 22,878,616 |
| **EQUITY** | | |
| Capital Stock | 500,000 | 500,000 |
| Earnings Year To Date | (7,204,692) | - |
| Shareholder Distributions | (55,519,814) | (55,519,814) |
| Total Earnings | 74,444,815 | 74,444,815 |
| **TOTAL EQUITY** | 12,220,309 | 19,425,001 |
| **TOTAL LIABILITIES & EQUITY** | 35,951,003 | 42,303,617 |